N THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
(HOUSTON DIVISION)

| | |
|---|---|
| In re:<br><br>SUNNOVA ENERGY INTERNATIONAL INC., et al.,[1]<br><br>     Debtors,<br>_____<br><br><br>ERIK WEATHERWAX, on behalf of himself and all others similarly situated,<br><br>     Plaintiff,<br><br>   v.<br><br>SUNNOVA ENERGY INTERNATIONAL INC, et al.,[2]<br><br>     Defendants. | **Chapter 11**<br>**Bankruptcy Case No. 25-90160 (ARP)**<br>**Jointly Administered**<br><br><br><br><br>**Adv. Pro. No.  25-03423 (ARP)** |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT
OF MOTION FOR CLASS CERTIFICATION**

---

[1,2] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Sunnova.  The location of Debtor Sunnova Energy International Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 20 East Greenway Plaza, Suite 540, Houston, Texas 77046.

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT ................................................................................................. 1

RELEVANT FACTS ............................................................................................................. 2

  A.  The Release Program Favors Some Employees and Disfavors Others, But All of the
Employees Face Risks ............................................................................................... 2

  B.  Three Employees: Weatherwax, Franz, Reed ........................................................... 5

    1.  Plaintiff Erik Weatherwax (Non-Signing) ...................................................... 5

    2.  Patrick Franz (Non-Signing) ........................................................................... 5

    3.  Adam Reed (RA NO-WARN) .......................................................................... 7

  C.  Plaintiff's Goals in this Action ................................................................................. 7

ARGUMENT ...................................................................................................................... 8

  I.  EMPLOYEES WHO SIGNED THE RELEASE AGREEMENT ARE
APPROPRIATELY CLASS MEMBERS ........................................................... 8

    A.  The RA WARN Class Members Have Not Received Full Payment ............................. 8

    B.  As Currently Interpreted for the RA NO-WARN Class Members, the RA is Invalid ... 8

  II.  PLAINTIFF CAN REPRESENT THE CLASS, BUT IF SUB-CLASS
REPRESENTATIVES ARE NEEDED, TWO ARE AVAILABLE TO REINFORCE
TYPICALITY, ADEQUACY ........................................................................... 11

  III.  THERE ARE NO INDIVIDUALIZED ISSUES (PREDOMINANCE) ......................... 14

    A.  The Single Site Issue Turns on Common Evidence ...................................................... 14

      1.  The Sixth Circuit's Application of the Regulations Makes the Analysis
Straightforward. ................................................................................................. 15

      2.  The Fifth Circuit Would Likely Follow the Sixth Circuit's Approach...................... 18

      3.  The Third Circuit's "Conduit" Standard is Determined Through Common
Evidence ............................................................................................................. 20

    B.  The Release Issue Turns on Common Evidence ......................................................... 24

  IV.  BOTH DEBTORS AND THE CLASS MEMBERS ARE BETTER SERVED BY A
CLASS ADVERSARY THAN THE INDIVIDUAL CLAIMS PROCESS
(NUMEROSITY, SUPERIORITY) ...................................................................... 25

CONCLUSION .................................................................................................................. 28

## **TABLE OF AUTHORITIES**

**Cases**                                                                                   **Page (s)**

*Binford v. First Magnus Fin. Corp.* (*In re First Magnus Fin. Corp.*),
  403 B.R. 659 (D. Ariz. 2009) ...................................................................................26

*Carpenters Dist. Council v. Dillard Dep't Stores*,
  15 F.3d 1275 (5th Cir. 1994) ...................................................................................19

*Ciarlante v. Brown & Williamson Tobacco Corp.*,
  Civ. No. 95-4646, 1995 U.S. Dist. LEXIS 18987 (E.D. Pa. Dec. 18, 1995) .................22, 24, 25

*Ciarlante v. Brown & Williamson Tobacco Corp.*,
  143 F.3d 139 (3d Cir. 1998) ...................................................................................20, 21

*Cortinas v. Liberty Mut. Pers. Ins. Co.*,
  No. SA-22-CV-544-OLG (HJB), 2025 U.S. Dist. LEXIS 7074 (W.D. Tex. Jan. 13, 2025) .....13

*Dasher v. RBC Bank*
  No. 20-13367, 2022 U.S. App. LEXIS 4277 (11th Cir. Feb. 16, 2022) .....................................12

*Davis v. Signal Int'l Tex. GP, L.L.C.*,
  728 F.3d 482 (5th Cir. 2013) ...................................................................................18, 19, 20

*Dorazio v. Allstate Fire & Cas. Ins. Co.*,
  No. CV-23-00017-PHX-KML, 2025 U.S. Dist. LEXIS 110548 (D. Ariz. June 10, 2025) .......25

*Fort Worth Indep. Sch. Dist. v. City of Fort Worth*,
  22 S.W.3d 831 (Tex. 2000) ...................................................................................10

*Gair v. Great Star Tools USA, Inc.*,
  No. 4:21-CV-00976, 2023 U.S. Dist. LEXIS 163753 (M.D. Pa. Sep. 13, 2023) .................12, 13

*Heartland Commc'ns v. Sprint Corp.*,
  161 F.R.D. 111 (D. Kan. 1995) ...................................................................................13

*Hooks v. Landmark Indus.*,
  797 F.3d 309 (5th Cir. 2015) ...................................................................................13

*Hoover v. Drivetrain LLC*,
  No. 20-50966, 2022 Bankr. LEXIS 2312 (Bankr. D. Del. Aug. 19, 2022) .................14, 21, 22

*In re Adam Aircraft Indus.*
  Nos. 08-11751 MER, 08-1366 MER, 2009 Bankr. LEXIS 4589 (Bankr. D. Colo. Mar. 19, 2009) ...................................................................................25

*Int'l Ass'n of Machinists & Aero. Workers v. Compania Mexicana De Aviacion*,
  199 F.3d 796 (5th Cir. 2000) ...................................................................................8

ii

*Jacob v. Steward Partners Glob. Advisory, LLC*,
  No. 1-23-CV-01179-DII, 2024 U.S. Dist. LEXIS 125708 (W.D. Tex. July 17, 2024) .......10, 11

*James v. City of Dall.*,
  254 F.3d 551 (5th Cir. 2001) ..................................................................................................11

*Liberto v. D.F. Stauffer Biscuit Co.*,
  441 F.3d 318 (5th Cir. 2006) ..................................................................................................10

*Likes v. DHL Express*,
  288 F.R.D. 524 (N.D. Ala. 2012) ............................................................................................23

*NEPC, Inc. v. Mei, LLC*,
  No. H-12-cv-706, 2013 U.S. Dist. LEXIS 101776 (S.D. Tex. July 22, 2013) .........................10

*Piron v. Gen. Dynamics Info. Tech., Inc.*,
  No. 3:19CV709, 2022 WL 363958 (E.D. Va. Feb. 7, 2022) .....................................................22

*Shaw v. Hornblower Cruises & Events, LCC*,
  No. 21 Civ. 10408 (VM), 2022 U.S. Dist. LEXIS 202703 (S.D.N.Y. Nov. 7, 2022) ...............23

*Teta v. Chow*
  712 F.3d 886 (5th Cir. 2013) .............................................................................................26, 27

*Thomas v. Teksystems,*
  Civil Action No. 2:21-cv-460, 2025 U.S. Dist. LEXIS 43003 (W.D. Pa. Mar. 10, 2025) ..........12

*Tittle v. Enron Corp.*
  228 F.R.D. 541 (S.D. Tex. 2005) ............................................................................................24

*Torres v. S.G.E. Mgmt.. L.L.C.*,
  397 F. App'x 63 (5th Cir. 2010) ..............................................................................................11

*Wiltz v. M/G Transp. Servs., Inc.*,
  128 F.3d 957 (6th Cir. 1997) ...............................................................................16, 17, 18, 20

## Other

20 C.F.R. § 639.3 ........................................................................................................15, 16, 19

Fed. Re. Civ. P. 23 .............................................................................................................12, 27

Plaintiff Erik Weatherwax ("Plaintiff") respectfully submits this Reply in Support of his Motion for Class Certification and Related Relief.  (Adv. ECF No. 12) ("Motion").  *See also* Corrected Motion (Adv. ECF No. 17), Opening Brief in Support (Adv. ECF No 12-1) ("Pl.'s Br.").  He responds to the arguments made by Defendants Sunnova Energy International Inc., *et al*. ("Defendants") in their Brief in Opposition (Adv. ECF No. 29) ("Def.'s Br.").

## SUMMARY OF ARGUMENT

Certifying a class and appointing class counsel will ensure the orderly administration of this bankruptcy case.  Defendants do not deny the consensus view that WARN allegations are model class claims.  But they contend the class procedures should be discarded due to two facts here: (a) Defendants promise to make WARN payments in a release agreement, which many have signed; and (b) some employees worked remotely.  These arguments are without merit. Some class members may be made whole over the course of this adversary proceeding, which Plaintiff would encourage.  But that possibility does not support forgoing the benefits of class procedures, both for them and the employees whose make-whole prospects are currently nil.  A class will get to the merits more efficiently and economically than the alternative: multiple, piece-meal lawsuits.

Defendants' WARN payment-for-release program is appropriate for class treatment rather than a separate lawsuit for each person.  It is not a standard cut-and-dry, offer and acceptance program.  It is a kaleidoscope of indefinite expressions that raise doubts as to who will be paid, when they will be paid and whether amounts will be correctly treated per the Bankruptcy Code.  No employee has been given definite answers.

The remote employee question is, similarly, common to the class and amenable to class adjudication.  The issue is what WARN considers the remote employees' "single site" of

employment to be.  Under persuasive Sixth Circuit precedent (which the Fifth Circuit would likely follow), Defendants' headquarters was the remote employees' single site because it was effectively Defendants' only WARN site – a class question.  Defendants may argue that the court should follow other precedent which contemplates a supervisor's home as a possible WARN site, but even under that precedent, the issue is best-suited for class treatment because it turns on evidence common to all the remote employees.  The presence of common evidence makes class certification appropriate.

Lastly, Defendants' argument that class members should be limited to the individual claims process does not hold sway in this Circuit or elsewhere.

## RELEVANT FACTS

Below, Plaintiff provides an overview of what counsel has been able to gather about the release program.

### A.  The Release Program Favors Some Employees and Disfavors Others, But All of the Employees Face Risks

The Release Agreement ("RA") has purportedly been signed by 728 out of 747 class members.  It promises them WARN damages they "may be owed."  But without the employees' knowledge, Defendants have unilaterally determined that only some of them are entitled to WARN damages (60 days' pay and benefits), and the rest are entitled to none.  The class therefore comprises the following three groups:

1.  Approximately 480-520 employees who signed the RA and purportedly will get WARN damages, according to Defendants (the "**RA WARN**" class members);

2.  Approximately 200 employees who signed the RA and will not get WARN damages, according to Defendants (the "**RA NO-WARN**" class members); and

3.   Approximately 13 employees who did not sign the RA (the "**Non-Signing**" class

members).

All three groups face risks absent representation.

Defendants purport that the RA WARN class members will get paid full WARN

damages.  This representation comes with no reference to where, when or how, in the bankruptcy

process such payments will be made in their entirety.  Payments in Chapter 11 are provided in

classifications and mechanisms set forth in a Plan consonant with the priority scheme of the

Bankruptcy Code.  If no provisions are made, even an allowed claim can end up being worthless.

The WARN amounts do not appear on any claim schedule or (seemingly) any list of planned

expenditures by the estate.[3]  Instead, Defendants have made partial payments to these employees

and say that the rest will come after the sale.  (*See* Lynch Decl., Adv. ECF No. 30, ¶5

("remaining amounts" to be paid "after the closing of the Sale Transaction"); Def's Br. at 17

(noting "employees awaiting completion of their severance payments").[4]  Yet, words alone are

not solid footing in a bankruptcy.  The RA WARN class members face the risk that they will

continue to be ignored in the articulated plan, left out of the ultimate distribution of assets, and

be equitably estopped from pursuing their claims.  These class members need class counsel

representation to ensure that this does not happen.

---

[3] Adding to the confusion, employees are getting notices from the claims agent that they have
been scheduled for priority claims in mysterious amounts (far less than WARN damages).  The
notices do not explain what these amounts represent, but nevertheless state that employees must
fill out a claim form if they dispute the amount shown on the notice.
[4] Defendants are thus speaking somewhat loosely at the outset of their brief when they say that
"WARN-eligible employees who executed releases *received* at least 60 days of pay and
benefits."  (Def.'s Br. at ¶2) (emphasis).  What Defendants mean is that they currently intend to
pay these amounts.

The <u>RA NO-WARN</u> class members, slated to get a few weeks' severance[5], face the risk of losing their far more valuable WARN claims on the basis of a legally invalid agreement.  As argued further below, Defendants' hollow offer to these employees—a release for *whatever WARN damages we deem fit for you*, which turns out to be nothing—is a legal nullity.  Contracts aside, these employees do in fact have WARN claims.  The remote-employee theory which Defendants may espouse to deny them WARN damages is mistaken.  The flawed theory would decide employees' WARN rights by rigidly assigning them their supervisor's home as a WARN "site" and then finding that site not covered by WARN.  As discussed further below, such a "site" theory is unmoored from WARN's regulations.  The Complaint alleges that these employees are WARN-covered.  They need representation to safeguard their WARN rights.

Defendants do not dispute that the <u>Non-Signing</u> class members may pursue WARN claims, but Defendants argue that they should be limited to the individual claims process.  The risk for these employees, as the Fifth Circuit (among many other courts) has recognized, is that giving employees only this option to pursue their WARN claims would effectively extinguish them.  If their individual proof of claim were objected-to, they will be unable to hire a lawyer to try their case, because it will cost them much more than their claim is worth.

Plaintiff's counsel has begun the process of bringing clarity to the RA program.  Counsel called on Defendants to acknowledge in their Disclosure Statement a commitment to pay RA amounts and the gap between Plaintiff's and Defendants' calculations.  There, Defendants now state that they have calculated approximately $8 million of WARN payments owed under the RA, of which $7 million will be treated as administrative expenses.  Plaintiff argues this is an

---

[5] The agreement promises the higher of WARN damages or normal severance.  These employees are credited with no WARN damages, leaving the severance as the "higher" amount.

undercount (because the RA NO-WARN class members should be getting WARN amounts), and that the true numbers are $12 million and $9.4 million, respectively. (Third Amended Disclosure Statement, Bankr. ECF No. 868 at 91). Plaintiff's input validates the benefit of a Class Counsel.

**B.  Three Employees: Weatherwax, Franz, Reed**

Plaintiff's and two class members' experiences illustrate the chaotic state of the RA program (and are instructive on the remote employee issue). Plaintiff contends he is a typical and adequate representative of the class. If the Court finds management sub-classes would be useful, putative class members Franz and Reed are willing to serve as sub-class representatives. As argued further below, that should not be necessary.

    1.  <u>Plaintiff Erik Weatherwax (Non-Signing)</u>

According to Defendants, Mr. Weatherwax (despite being a remote employee himself) would be treated as WARN-eligible in the RA program, although he has not signed the RA. His WARN damages are about $27,000. He received a notice that he has been scheduled for a priority claim of $3,956.05. However, the schedules do not identify him by name. The undersigned has not been able to determine what this amount is for. He therefore has no assurance of where he fits in bankruptcy other than his class action complaint.

    2.  <u>Patrick Franz (Non-Signing)</u>

At the time of his termination, Mr. Franz was a Vice President of Software Engineering. He worked remotely from California. Defendants treat him as a WARN-ineligible employee.

Franz oversaw the Software organization, which built and maintained software supporting Defendants' business functions. It had a headcount of 110 employees at its peak. (Declaration of Patrick Franz, attached hereto as **Exhibit A**, ¶¶ 3-4). In the later period of his employment, his direct supervisor worked remotely from his Boston home, but had a named

office in the Houston headquarters and came into that office regularly, about five days a month. The supervisor reported to then-Chief Operating Officer Paul Matthews, who worked out of headquarters (until the organizational chart shifted right before the bankruptcy).  (*Id.*, ¶¶ 5-6).

Franz testifies to his regular reporting to senior leadership in Houston.  (*Id.*, ¶¶ 8-10, 13 (weekly slides, bi-weekly reports, Quarterly Business Reviews, incident management outcomes)).  The software department used Jira, a project management software, to track progress on tasks.  Defendants used a wide array of metrics—captured through Jira and other software monitoring programs—to track the software department's performance, running the gamut from the large-scale (progress in developing specific software features) to the granular (page-loading and cycle times for software created by the department).  (*Id.*, ¶¶ 7-8).  C-suite management had regular involvement in his work, including meetings where they discussed the software features they thought needed to be prioritized, and their retention of consultants whose recommendations the software department was directed to follow.  C-suite authorization was required for new business-related software features that Franz's team of developers worked on. (*Id.*, ¶14).  Other departments in the company had their own project management software, and they similarly submitted weekly reports on their activities to the C-suite.  (*Id.*, ¶¶ 11-12).

Mr. Franz received no WARN notice before his termination on May 30.  He received the RA and an email stating that if he signed it, he would have a priority claim of $17,150 and a general unsecured claim for "amounted owed" above that.  He did not sign the RA.  His WARN damages are about $37,000.  He received a notice from the claims agent that he had a priority claim for $17,150 and a general unsecured claim of $158.00.  He is available to represent a sub-class of remote employees, if necessary.  (*Id.*, ¶¶ 15-19).  He, too, has no assurance of where he fits in the bankruptcy other than as putative class member in the class action.

6

3.   Adam Reed (RA NO-WARN)

Mr. Reed was a Director of Developer Operations, a team adjacent to Franz's software developers.  (Declaration of Adam Reed, attached hereto as **Exhibit B**, ¶¶ 1-3).  He worked remotely, primarily from his home in Austin, Texas.  (*Id.*, ¶2).  A cursory look at the company's organizational chart at the time of his termination would not accurately reflect his situation – his actual supervisor had just left the company and he had never spoken to the person listed as his "supervisor."  (*Id.*, ¶8).

His team used the same project management software as Franz's, and his priorities were dictated by the company directives that he observed in regular leadership meetings.  (*Id.*, ¶¶ 4, 9-10).

Mr. Reed's WARN damages are about $37,000.  He signed the RA.  By all accounts, Defendants intend to treat him as an RA NO-WARN class member.  He has received a payment for around $6,000 since signing the RA.  He received a notice from the claims agent saying that he has a priority claim for $7,692, without explanation.  He is available to represent the RA-signing class members.  (*Id.*, ¶¶ 11-16).  Like Weatherwax and Franz, he has no assurance of where he fits in the bankruptcy other than as putative class member in the class action.

**C.  Plaintiff's Goals in this Action**

Plaintiff supports Defendants' stated intentions to make some employees whole from a WARN standpoint.  Plaintiff is not seeking to undo or hinder any progress made toward doing so.  Rather, Plaintiff's goals are two-fold: (a) to ensure that Defendants' current plan actually plays out for the RA WARN class members (including additional clarity along the way), and (b) to bring that plan into conformity with WARN by securing WARN payments for the current RA NO-WARN and Non-Signing class members.

7

<u>ARGUMENT</u>

I.    **EMPLOYEES WHO SIGNED THE RELEASE AGREEMENT ARE APPROPRIATELY CLASS MEMBERS**

Defendants take as a given that the RAs are enforceable and that they prevent the employees' participation in this case.  Defendants are mistaken on both counts.

To be sure, WARN releases for "valid consideration" which has been "paid," are enforceable, as in the cases cited by Defendant.  *Int'l Ass'n of Machinists & Aero. Workers v. Compania Mexicana De Aviacion*, 199 F.3d 796, 798 (5th Cir. 2000).  The releases here do not meet that description, for two reasons.  First, the RA WARN class members have not received their full consideration yet and the RA explicitly allows them to enforce the RA.  Second, for the RA NO-WARN class members, their agreements (as currently interpreted by Defendants) are contractual non-starters because Defendants' representations were too indefinite to constitute offers.

**A.  The RA WARN Class Members Have Not Received Full Payment**

Defendants have not yet paid the full WARN amounts to the RA WARN class members.  By its own terms, the "[RA] may be enforced by [the parties thereto]," including the employees.  (Adv. ECF No. 30-1 at 2).  Class certification would allow the RA WARN class members to enforce their RAs and ensure they are paid fully.

**B.  As Currently Interpreted for the RA NO-WARN Class Members, the RA is Invalid**

For those whom Defendants have deemed WARN-ineligible, Defendants' interpretation of the RA renders the contract null from its inception.  The RA promises the "higher of" two amounts:

> [T]he higher of (a) the applicable Severance provided for in [Defendants' Severance Pay Plan ("**SPP**")] or (b) the applicable **amount that may be owed to such Employee under** the Worker Adjustment and Retraining Notification Act of 1988 ("**WARN**").

(Adv. ECF No. 30-1 at 2) (emphasis added).

Of the two amounts being weighed against each other, the first one (amounts under Defendants' SPP) is definite.  The SPP, which is an ERISA plan, has a severance formula based on objective inputs (years of service).  The WARN amount, however, is not definite: it is described simply as an amount which "may be owed" under WARN.

There are two ways to interpret this WARN-amount clause, only one of which could be legally binding.  The first interpretation is what Defendants are applying to the RA WARN class members: maximum WARN damages of 60 days' pay and benefits.  This is a fair reading of the RA, because the employee who receives maximum WARN damages can rest assured that she has gotten what she "may be owed" under WARN.  Indeed, full damages is the *only* amount of money that can be said to guarantee fulfillment of that language.

The second interpretation—which Defendants appear to espouse for the RA NO-WARN class members—is that "amount[s]…owed" under WARN means *whatever Defendants decide* the employee is owed under WARN.  This interpretation would render the RAs void under two related contract principles.  The first is the rule against **indefiniteness**.

> The elements of contract formation in Texas are offer, acceptance, and a meeting of the minds. [].  The phrase "meeting of the minds" describes the necessary mutual understanding regarding the essential terms of the contract. [].  This mutual understanding on essential terms must be sufficiently definite in its terms so that a court can understand what the promisor undertook. [.] [I]f an alleged agreement is so indefinite as to make it impossible to fix the legal obligations and liabilities of the parties, it cannot constitute an enforceable contract.

*NEPC, Inc. v. Mei, LLC*, No. H-12-cv-706, 2013 U.S. Dist. LEXIS 101776, at *14-15 (S.D. Tex. July 22, 2013) (citations and quotations omitted).  The rule against indefiniteness focuses on material terms of an agreement: "[i]t is well settled law that when an agreement

leaves material matters open for future adjustment[,] … it is not binding upon the parties." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000).  Unsurprisingly, a contract's price is a material term: where an agreement "lack[s] the essential term of the amount … [one party] would receive" under the agreement, "it is unenforceable." *Id. See also Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 324 (5th Cir. 2006) ("Texas courts have consistently held that a contract may be held void for indefiniteness if it fails to specify … the price to be paid[.]"); *NEPC*, 2013 U.S. Dist. LEXIS 101776, at *17 (S.D. Tex. July 22, 2013) (contract unenforceable where price terms included a payment schedule that could be reduced "proportionally" based on underperformance, but terms did not define "proportionally");

Under Defendants' interpretation, the RA was never a valid, enforceable contract. Defendants made an indefinite offer: the WARN amount (and consequently, the ultimate "higher of" amount) being offered was left open for a later determination (and an inherently subjective one at that).  This gaping hole in the RA prevented it from becoming a contract.

The second principle is the rule against **illusory promises**.  An illusory promise is one in which "the promisor retains the unilateral power to … modify terms in its sole discretion." *Jacob v. Steward Partners Glob. Advisory*, LLC, No. 1-23-CV-01179-DII, 2024 U.S. Dist. LEXIS 125708, at *10 (W.D. Tex. July 17, 2024).  Such a promise effectively "fail[s] to bind the promisor." *Id.*  For this reason, "[w]hen illusory promises are all that support a purported bilateral contract, there is no mutuality of obligation, and therefore, no contract." *Id.* (quoting *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010)).[6]  According to Defendants' *whatever-we-decide*

---

[6] This issue frequently arises in the context of employee handbooks and arbitration agreements. Where the employer retains sole discretion to modify the terms of these policies/agreements, they are not enforceable contracts. *See Torres v. S.G.E. Mgmt.. L.L.C.*, 397 F. App'x 63, 68 (5th Cir. 2010) (arbitration agreement unenforceable where employer could unilaterally "eliminate[]

interpretation of the RA, it was an illusory promise.  Defendants would retain unilateral discretion to determine what was owed to the employee under WARN.  That is an illusory promise, leaving the RA unenforceable.

In sum, all RA class members have live controversies: the RA WARN class members have unfulfilled RAs and the RA NO-WARN class members have unimpaired WARN claims. To be sure, though, class certification does not require a decision on these merits questions.  At this juncture, it is sufficient to recognize that these two questions turn on common evidence: (1) whether the RA WARN class members have been fully paid is determinable with reference to a single payroll spreadsheet; and (2) whether the RA NO-WARN agreements are indefinite/ illusory turns simply on the language of the RA.  Thus, along with the Non-Signing employees, the RA class members are entitled to enforce their WARN rights as part of this class proceeding.

## II. PLAINTIFF CAN REPRESENT THE CLASS, BUT IF SUB-CLASS REPRESENTATIVES ARE NEEDED, TWO ARE AVAILABLE TO REINFORCE TYPICALITY, ADEQUACY

Defendants claim that the presence of two issues—releases and remote employees— prevent Plaintiff from representing the full class' claims because of variations among the class members.  These are marginal issues, however, compared to the common questions of whether they were all let go in a shutdown without 60 days' notice.  There is no dispute they share these predominant questions to be answered.  *See James v. City of Dall.*, 254 F.3d 551, 571 (5th Cir. 2001) ("If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.").  Even so, two class members are available, if necessary, to serve as sub-class representatives on the various sides of these factual lines.

---

or modif[y]" its obligation to arbitrate) (Texas law); *Jacob v. Steward*, 2024 U.S. Dist. LEXIS 125708, at *11 (collecting cases).

Defendants' claim that Plaintiff's non-signing of the release is barrier to his representing those who did, is spurious. Plaintiff sued for himself and all class members terminated with him. He has every incentive to fight to allow those class members to clear their additional hurdle of a release unless their claim is fully satisfied. The release question does not actually affect Plaintiff's Rule 23 typicality or adequacy. The typicality question asks whether "*the class representative*"—not the class members—is "subject to a [unique] defense that is … likely to become a major focus of the litigation." *Gair v. Great Star Tools USA, Inc.*, No. 4:21-CV-00976, 2023 U.S. Dist. LEXIS 163753, at *11 n.45 (M.D. Pa. Sep. 13, 2023) (where class members purportedly signed arbitration agreements, but named plaintiff did not, plaintiff's claims were nevertheless typical because arbitration "defense d[id] not apply to [plaintiff]") (emphasis in original) (quoting *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009)). Courts routinely find typicality where, for example, putative class members allegedly signed arbitration agreements, while the named plaintiff did not. *See, e.g.*, *Thomas v. Teksystems*, Civil Action No. 2:21-cv-460, 2025 U.S. Dist. LEXIS 43003, at *59 (W.D. Pa. Mar. 10, 2025) ("strong predominance cannot be overcome by a potential arbitration agreement defense as to some members" and court could create a sub-class for them); *Dasher v. RBC Bank (USA) (In re 1:09-md-02036-JLK, Checking Account Overdraft Litig.)*, No. 20-13367, 2022 U.S. App. LEXIS 4277, at *16 (11th Cir. Feb. 16, 2022) ("Even if an arbitration defense would be dispositive as to most class members … there is still a sufficient nexus … between Dasher's [substantive] claims and the class's claims to render Dasher typical under Rule 23(a)(3) (quotations omitted); *Wright v. Greensky Mgmt. Co.,* No. 20-CV-62441, 2022 U.S. Dist. LEXIS 213764, at *12 (S.D. Fla. Nov. 28, 2022) (issue can be "resolved by creating a subclass … rather than denying certification").

Nevertheless, the Court need not decide this question.  Class member Adam Reed, who signed the RA, is willing to act as a sub-class representative on the release question, if necessary. *See Gair*, 2023 U.S. Dist. LEXIS 163753, at *11 (finding typicality for the named plaintiff but, as a precaution, appointing sub-class representative for employees who signed arbitration agreement).

The second purported obstacle posed by Defendants is the "single site" issue for remote employees—that is, some class members will need to show that their WARN "site" was the Houston headquarters, as alleged in Plaintiff's Complaint.  Although Plaintiff was himself a remote employee, Defendants claim that they have deemed him WARN-eligible, thereby removing his incentive to pursue this argument for the other employees.

Defendants' argument fails on numerous grounds.  As an initial matter, in the Fifth Circuit, "defendant-induced mootness in the class action context" is a matter of "concern." *Hooks v. Landmark Indus.*, 797 F.3d 309, 315 (5th Cir. 2015) (tender offers to named plaintiff). Defendants' decision to interpret the WARN regulations in Plaintiff's favor ought not be considered for his typicality, as it would "risk placing the defendant in control of a putative class action, effectively allowing the use of tactical procedural maneuvers to thwart class litigation at will." *Cortinas v. Liberty Mut. Pers. Ins. Co.*, No. SA-22-CV-544-OLG (HJB), 2025 U.S. Dist. LEXIS 7074, at *13 (W.D. Tex. Jan. 13, 2025) (quoting *Radha Geismann, M.D., P.C. v. ZocDoc*, Inc., 909 F.3d 534, 543 (2d Cir. 2018)).  *See also Heartland Commc'ns v. Sprint Corp.*, 161 F.R.D. 111, 116 (D. Kan. 1995) ("Were it otherwise," class certification motions could "be defeated simply by the vehicle of filing a counterclaim against the named plaintiffs.").

Even if it were considered, though, the argument fails because this minor variation between Plaintiff (whose "site" is conceded) and the class members (whose "site" is disputed)

pales in comparison to their core WARN claims, which are one and the same.  WARN courts have addressed this specific question before.  In *Hoover*, the named plaintiffs physically worked at the undisputed WARN "site," and sought to represent a class that included remote employees (alleged to "report to" that site).  The court found "no immediate conflict or adversity between those claimants who were physically resident in Las Vegas and remote employees. The only difference is that the remote employees have a further obstacle to clear[.]"  *Hoover v. Drivetrain LLC*, No. 20-50966, 2022 Bankr. LEXIS 2312, at *29 (Bankr. D. Del. Aug. 19, 2022).  "[T]hese wrinkles do not preclude a finding of typicality in the face of the basic uniformity of the principal legal theory that undergirds the claims of every member of the class."  *Id.* at *19.

Again, while Plaintiff is more than adequate as a class representative, the Court need not decide the question.  Class member Patrick Franz, whom Defendants treat as a WARN-ineligible remote employee, is willing to act as a sub-class representative on this issue.

## III.   THERE ARE NO INDIVIDUALIZED ISSUES (PREDOMINANCE)

Defendants rely on the same two issues—the "single site" issue and the releases—to argue against predominance.  Defendants claim these issues will require individualized inquiries, precluding class certification.  Defendants do not support these generic assertions.  They are, ultimately, hollow.  Common bodies of evidence will drive the determination of both issues.

### A.  The Single Site Issue Turns on Common Evidence

The single site issue will turn on common evidence, under either of the two theories in the case law.

First, under the Sixth Circuit's "single site" standard for remote employees, the "site" question here has all but been answered already.  The Houston headquarters was effectively

Defendants' *only* WARN site[7]: by definition, all the remote employees must be assigned to that site.  The Sixth Circuit's application of the standard is both loyal to the text of the regulations and consistent with WARN's remedial purpose.  While the Fifth Circuit has not spoken directly to the remote employee issue, the appellate court—whose "single site" precedent similarly emphasizes practicality, over undue rigidity, to effectuate Congress' intent—is likely to align with the Sixth Circuit's approach.

By contrast, Defendants' claimed need to investigate the "decision-making authority" of supervisors (Def.'s Br. at 14, ¶3) only has relevance under a particular strain of Third Circuit precedent, one whose narrow focus imposes questionable and unworkable restraints on WARN rights.  Yet, *even* under that approach, the courts recognize that the issue is easily determined through common bodies of evidence.

1.  The Sixth Circuit's Application of the Regulations Makes the Analysis Straightforward.

The Complaint alleges that the class members here had their WARN "site" at the Houston headquarters, the site of the WARN-covered layoff.  (Compl., Adv. ECF No. 1, ¶11).  WARN addresses remote employees in what is sometimes referred to as "Subpart 6" of the regulations.  Subpart 6 assigns employees to a company facility "site" when they work remotely, that is, "outside of any of the employer's regular employment sites[.]" 20 C.F.R. § 639.3(i)(6).  For such employees, their single site is the "site…from which their work is assigned, or to which they report." *Id.*  Plaintiff alleges that Houston was that site, for all remote employees.

Defendants disagree, for purposes of the RA.  They may argue that the remote employees should be tagged with a "site" based on where the employee's (remote) supervisor was

_____

[7] *See infra* n.11 regarding a small potential second site.

physically located—*e.g.*, if the supervisor worked from home in Kansas, the employee's "site" would be Kansas under that theory.

Under the regulations, such a position is paradoxical.  On the one hand, it concedes the basic framework of the Subpart 6 analysis for the remote employee herself: because she works "outside of any of [Sunnova's] regular employment sites," this theory would use assignment/reporting factors to determine her site.  20 C.F.R. § 639.3(i)(6).  But it would then posit that those factors lead simply to her supervisor's home.  The problem with this position is that the supervisors were, *themselves*, remote.  (Def.'s Br. at 14 n.6 ("[T]he only potential dispute relates to the remaining remote employees who report in to other remote workers[.]")).  Subpart 6 asks what *site* an employee reports to, not what *person.*  Thus, even if an employee were found to "report" to her supervisor for WARN purposes, that would not end the inquiry.  Determining the employee's site would require another step: determining the *supervisor's* site by applying the same Subpart 6 analysis to the supervisor (*i.e.*, by asking where the *supervisor's* assignments came from and where the *supervisor* reported).[8]  As long as the reporting chain consists of remote employees, this analysis would be repeated up the chain until it arrives at a *site.*  When an employer only has one physical WARN site, the endpoint of the Subpart 6 analysis is inevitable.  It will land at that site.  Here, that site is the Houston headquarters.

The Sixth Circuit recognized this basic WARN reality in *Wiltz v. M/G Transp. Servs.*, *Inc.*, 128 F.3d 957 (6th Cir. 1997).  The *Wiltz* employer operated towboats, and the question there was the appropriate WARN "site" for crew members on the boats.  Having determined that the boats themselves were not WARN "sites," the court applied Subpart 6 to the crew members.

---

[8] Put differently, if the remote employee's home is not a "site," neither is the supervisor's home. Applying Subpart 6 to the employee, but not the supervisor, is arbitrary.

16

Much like Defendants' remote workforce here, there were multiple levels of supervision within the non-"site" towboats: "The captain was the ranking supervisor of the vessel. The captain, pilot, mate and chief engineer gave work instructions to the crew members that reported to them." *Id*. at 959.   For the lowest crew member, then, the immediate giver of their assignments, and the person to whom they directly reported, was still on the boat—it was the captain, the pilot, the mate or the chief engineer.   If (as suggested by Defendants' possible position) the Subpart 6 analysis simply lands on the direct supervisor, the crew members' site would have been *on the boat*.   Yet, the court had just found that the boat was <u>not</u> a site.

The Sixth Circuit did not run into this paradox.   The *Wiltz* employer only had one physical site: its headquarters in Paducah, Kentucky.   *Id.* at 962.[9]   "[A]bsent the fiction that the towboats here were 'floating sites,' the only conclusion to be drawn on this record is that Paducah was the 'single site of employment' for plaintiffs." *Id.* at 962.[10]

Like the *Wiltz* employer, Defendants seemingly had only one site for their employees: the Houston headquarters.[11]   Under a plain reading of Subpart 6, which requires finding a "site" for remote employees, Houston will be that site.   There is clearly no need for individualized inquiries under the Sixth Circuit's approach to Subpart 6.

---

[9] "[I]n a confidential communication to Ingram on November 24, 1994, counsel for M/G represented that '[o]ne port, Paducah, Kentucky, is used in our employee system.'" *Id*. at 962.

[10] The court described how the supervisory chain led up to Paducah, and noted Paducah's general role in overseeing the work.   But the court had no reason to parse through the respective levels of discretion exercised by each supervisor within the hierarchy that led up to Paducah.   That did not matter because Paducah was the only *site* available in the Subpart 6 analysis.

[11] Defendant seemingly had an additional space near the Houston headquarters, where a small number of billing/customer care employees may have worked.   If necessary, adjudicating the WARN relevance of this site—including (a) whether it would be aggregated with headquarters, and (b) whether any remote employees reported to it—would rely on common evidence, including the same types of evidence discussed *infra* concerning the remote employees generally.

2.  <u>The Fifth Circuit Would Likely Follow the Sixth Circuit's Approach</u>.

The Fifth Circuit's understanding of the "single site" regulations is similar to the Sixth Circuit's.  Although the Fifth Circuit has not comprehensively addressed Subpart 6, it has addressed Subpart 8 on numerous occasions.  In doing so, it has recognized the same goal that *Wiltz* recognized in Subpart 6: accommodating unique employment circumstances within WARN's protections.

*Wiltz* explained that Subpart 6 was intended to accommodate a particular kind of worker whose circumstances did not fit neatly into the paradigm found elsewhere in WARN.  WARN often places an emphasis on geographic proximity as important factor in determining notice obligations: "the general rule is that separate facilities are separate sites" when determining whether WARN's thresholds have been triggered.  *Davis v. Signal Int'l Tex. GP, L.L.C.*, 728 F.3d 482, 485 (5th Cir. 2013) (quotations and citations omitted).  Courts have understood the geographic proximity principle as reflecting one of WARN's purposes, to prevent the impact mass layoffs could have on local communities surrounding an employer's operations.  *Wiltz* recognized, however, that the geographic proximity principle occasionally gives way to WARN's primary purpose: protecting workers themselves.  As the Sixth Circuit explained, Subpart 6 represents a limited departure from the "geographic proximity" principle:

> As a practical matter, there is probably little geographic impact under the scenarios described in subpart (6). Notwithstanding, the Department of Labor felt that mobile workers needed some protection, and we must accommodate that concern in our interpretation of the Act and regulations.

*Wiltz*, 128 F.3d at 963 n.10.

The Fifth Circuit has expressed a similar understanding of the regulations in its Subpart 8 cases.  The question in *Davis* was whether layoffs at two sites—a fabrication "yard" and an administrative "annex" building about a mile away—could be combined for WARN coverage

18

(neither site had sufficient layoffs, on its own, to trigger WARN). 728 F.3d at 487. The court applied Subpart 8, which states that WARN protection should be afforded where "truly unusual organizational situation[s]" are present. 20 C.F.R. § 639.3(i)(8). The court took heed of the Department of Labor's explanation that Subpart 8 was intended to "maintain … flexibility in the definition of 'single site of employment.'" *Davis*, 728 F.3d at 488 (quoting 54 Fed. Reg. at 16050). While the *Davis* defendant argued the "annex" and the "yard" had "different operational purposes," and should thus be kept separate under WARN, the Fifth Circuit found that approach unduly rigid and inconsistent with the animating purpose of the regulations:

> Of course it is true that different units within the same operation will have different purposes if one dissects those purposes finely enough. However, what matters in determining whether separate facilities constitute a single site of employment is not the immediate purpose of this or that facility, but rather what ultimate *operational* purpose is served by the facilities. …
>
> Signal's administrative activities make sense only in relation to the fabrication activities that they support; conversely, fabrication requires the support of administration at all times. It is not as if the administration and fabrication facilities are each stand-alone, independent operations.

728 F.3d at 487-8. The court held that layoffs from the two sites must be combined for WARN purposes.[12]

*Wiltz* and *Davis* share a common approach to WARN's regulations. "Dissect[ing]" the functions of two sites, while ignoring their "ultimate operational purposes," just to deny employees WARN coverage, does not "make sense" under regulations designed for flexibility

---

[12] The *Davis* decision was consistent with the court's earlier decision in *Carpenters Dist. Council v. Dillard Dep't Stores*, 15 F.3d 1275, 1290 (5th Cir. 1994). There, the court found that two sites, which had originally been combined but were "separated because of space considerations," should also be combined under Subpart 8. While the district court had found the two sites separate for WARN purposes, the appellate court reversed, finding that "[t]hese employees were entitled to the WARN Act notice of termination, and, consequently, Dillard is liable for any damages associated with providing inadequate notice." *Id*. at 1291.

and worker protection. *Davis*, 728 F.3d at 487-8. Similarly, constructing "fiction[al]" WARN sites for remote employees (effectively removing them from WARN) contravenes the legislative imperative that these "workers needed some protection." *Wiltz*, 128 F.3d at 962 and 963 n.10. The Fifth Circuit is likely to agree that when an employer only has one WARN site, that is the site for its remote employees. [13]

   3. <u>The Third Circuit's "Conduit" Standard is Determined Through Common Evidence</u>.

  Defendants' arguments are geared toward Third Circuit precedent—specifically, the appellate court's split decision in *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 147 (3d Cir. 1998). There, the plaintiffs were traveling sales representatives, determined by the Court to be a Subpart 6 workforce. Their immediate supervisors were district managers who, "like the sales representatives…worked from home and had no other permanent office." *Id*. at 142. While the plaintiffs claimed (and the lower court agreed) that the employer's central administrative office was their single site, the appeals court remanded the case for further factual development, under a view that the district managers (themselves) could conceivably be considered the plaintiffs' WARN site. *Id*. at 149. The court stated that the question would turn on whether the immediate supervisors were "the ultimate origin and destination of" assignments and reporting versus "mere conduits through which the information … passed" from the facility to the employees and vice versa. *Id.* at 149. The *Hoover* court, bound by the *Ciarlante* decision,

---

[13] Indeed, Defendants' possible approach to the site question would reflect a degree of "dissecting" which the Fifth Circuit is unlikely to condone. Assigning employees to their immediate supervisor's home would give a company's organizational chart dispositive status for WARN rights. That elevates form over function. For instance, class member Adam Reed testifies that his immediate supervisor left the company shortly before the layoff. At that point, his "dotted line" pointed up to someone he had never spoken to. Having WARN rights hang in the balance whenever there is a shift in the dotted lines cannot be what Congress intended. Organizational charts are helpful to understand the major lines of reporting within a company, but they cannot be so mechanically (and minutely) applied to WARN rights.

articulated the standard as measuring "the degree of autonomy" an intermediary supervisor has, and whether it is sufficient to "break the chain" between the employee and the claimed site. *Hoover v. Drivetrain LLC*, No. 20-50966, 2022 Bankr. LEXIS 2312, at *13 (Bankr. D. Del. Aug. 19, 2022). According to Defendants, that "degree of autonomy" question is an individualized issue.

To be clear, the *Ciarlante* majority's approach—which contemplates giving employees a non-site "site" (which will virtually never have 50 employees), thus effectively foreclosing their WARN rights—is not without its critics, including then-Chief Judge Becker, who penned a strongly worded dissent.[14] This Court is under no obligation to go down the *Ciarlante* "conduit" here. Even if it chose to do so, however, the "conduit" question itself is answerable through common evidence. As noted in Plaintiff's Opening Brief (Pl.'s Br. at 18), the very same *Hoover*

---

[14] Chief Judge Becker's dissent first pointed out the unequivocal evidence that the district managers were, themselves, only passing along instructions that they had received from the central office, making that office the true source of the assignments for Subpart 6 purposes. 143 F.3d at 154-156 (Becker, C.J., dissenting). He then (presciently) expressed his concern with the majority's approach generally:

> This is the first time that a court has been asked to apply 20 C.F.R. § 639.3(i)(6) to determine the single site of employment for a geographically dispersed workforce that does not physically report to any site of employment at any time. …

> I suspect that such situations represent the new frontier in WARN Act litigation. In the next decade, technology will permit workers of all types, not just salespeople or other mobile workers, to escape the physical confines of traditional offices. …

> [T]he tenor of the majority opinion, and its refusal to affirm the grant of summary judgment for plaintiffs on what I believe to be an unequivocal record, sends the … wrong …message and, I think, establishes bad precedent.

*Id*. at 156-157 (Becker, C.J., dissenting). The Sixth Circuit's approach—tying Subpart 6 employees to the only company facility available in the analysis—prevents an erosion of WARN's protections in today's age of increasingly remote work.

21

decision certified the largely remote WARN class there.[15]  It did so because the reporting question is determinable based on common evidence.  A small number of high-level managers can testify to a company's overall reporting structure, including the role played by intermediary supervisors.  In *Hoover*, the court found that the heads of the company's two largest departments could be sufficient to answer the "site" question for the class members, and if any more managers' testimony were needed, the number "seem[ed] manageable."  2022 Bankr. LEXIS 2312, at *24-25.  It certified the class.

Defendants have no response to *Hoover*, and Mr. Franz's testimony is an example of what the *Hoover* court meant.  He testifies regarding his department within the company—the software organization—explaining how the organization's metrics were submitted to the C-suite in Houston and how the C-Suite shaped the organization's work.  (Ex. A, Franz Decl., ¶¶ 8-14).  Similar testimony may easily be obtained from heads of the other verticals in the company.  While the merits weight of Franz's testimony need not be assessed at this juncture, he demonstrates *Hoover*'s insight.  A small number of managers can, themselves, be common bodies of evidence for the entire class.

A second body of common evidence are databases tracking employee performance, which illustrate how work was monitored from the headquarters. *See, e.g.*, *Piron v. Gen. Dynamics Info. Tech., Inc.*, No. 3:19CV709, 2022 WL 363958, at *3 and *13 (E.D. Va. Feb. 7, 2022) (certifying WARN class of more than 800 remote background investigation workers) (noting "strong support for the Plaintiffs' position that the mobile workforce was directed from

---

[15] Indeed, the *Ciarlante* district court certified the class, noting the common quality of the "site" issue.  *See Ciarlante v. Brown & Williamson Tobacco Corp.*, CIVIL ACTION NO. 95-4646, 1995 U.S. Dist. LEXIS 18987, at *3 (E.D. Pa. Dec. 18, 1995) (finding no "reason [to] preclude[e] the named plaintiffs from attempting to prove, on behalf of the class, that the layoffs did fit the 'single site' definition").

the [Project Management Office ("PMO")] and describing, inter alia, the PMO's "Case Management System" which ensured "[c]ontinuity for field investigations across the country"). These kinds of databases—operational, or even administrative—are common tools for large companies with sizable remote workforces.  As Franz and Reed testify, Jira was one such database used by the software side of the company.  Franz testifies to some of the similar programs used by other departments.  (Ex. A, Franz Decl., ¶¶ 7, 12; Ex. B, Reed Decl., ¶4). These project management tools provide a basis for determining the relationship between a site and those employees.

No court has ever denied WARN class certification because of the supposedly individualized nature of the "conduit" question.[16]  Even if the Court were to adopt the *Ciarlante* approach to this issue, there will be ample bodies of common evidence.

---

[16] Defendant's only case on this issue is *Likes v. DHL Express*, 288 F.R.D. 524, 530 (N.D. Ala. 2012), in which the plaintiff sought to certify a sprawling, nationwide WARN class utterly incomparable to the class here.  The *Likes* plaintiff sought to represent thousands of drivers across the country who did not even work for the defendant, DHL.  Instead, they worked for a network of companies contracted to deliver goods for DHL, until DHL terminated the contracts. The WARN claim was riddled with problems, including questions surrounding who the drivers' employers were.  The *Likes* class failed even on the initial "ascertainability" requirement because of difficulty in identifying the class members altogether.  *Id.* at 530.  More pertinently, the "single site" issue there confusingly intersected with the multi-employer problem: the court appeared concerned about "the circumstances surrounding DHL's dealings with the contracting parties under the various Cartage Agreements and Termination and Transition Agreements." 288 F.R.D. at 530.  Throughout the opinion, the court referred to *that* question as the "single site of employment situation," seemingly because of the plaintiff's misdirected argument that the agreements between DHL and the contractors "transforms this case into a single site of employment."  *Id.* at 531.  (*Ciarlante* is not discussed in the opinion.)  There are no such issues here.  Defendants have readily identified the class members.  (Def.'s Br. at 3 (747 employees terminated May 30 and June 16)).  They are alleged to have one WARN site: Houston.  Where a WARN class's employer is known, and the relevant sites are clearly alleged, "*Likes* is not on point."  *Shaw v. Hornblower Cruises & Events, LCC*, No. 21 Civ. 10408 (VM)2022 U.S. Dist. LEXIS 202703, at *20 (S.D.N.Y. Nov. 7, 2022) (declining to strike class allegations in putative WARN action on behalf of hundreds of employees terminated at various sites across the country).

**B.  The Release Issue Turns on Common Evidence**

Defendants observe that, for the class members who signed the RA, certain facts surrounding those releases would be different for different employees.  (Def.'s Br. at 14-15) (noting employees had "different severance amounts, had varying tenure and positions, and may have had different information available when making their settlement decisions").  Defendants do not explain, however, how these factual wrinkles affect predominance.  Certain questions, like the amounts paid to the employees, and their tenure/position, are easily answered with reference to a single spreadsheet.  Other questions are just irrelevant: the "information available" to the employees is not relevant to Plaintiff's indefinite/illusory challenge to the release, which turns simply on the language of the agreement itself.  There is nothing individualized about the release issue here.

Defendants cite the district court's decision in *Ciarlante v. Brown & Williamson Tobacco Corp.*, CIVIL ACTION NO. 95-4646, 1995 U.S. Dist. LEXIS 18987, at *5 (E.D. Pa. Dec. 18, 1995), where the court excluded from the class employees who signed releases.  The case is highly distinguishable.  First, the *Ciarlante*'s plaintiff's attack on the releases was vague, leaving the court to speculate that the "state of mind of each individual signer would presumably need to be explored."  *Id.*  By contrast, the unenforceability issues here are clear, entirely document-based and common to the class members, who purportedly signed the same agreement.  It is a paradigmatic class issue.  *See Tittle v. Enron Corp. (In re Enron Corp. Sec.)*, 228 F.R.D. 541, 556 (S.D. Tex. 2005) (certifying settlement class which included purported releasees where there was no evidence that the circumstances were "unique as to each … releasee"); *Dorazio v. Allstate Fire & Cas. Ins. Co.*, No. CV-23-00017-PHX-KML, 2025 U.S. Dist. LEXIS 110548, at *37 (D. Ariz. June 10, 2025) ("Whether the releases are effective is another question common to

24

the class—or the subclass of individuals who signed one—and does not defeat predominance.").

Second, and more critically, the releases in *Ciarlante* were fundamentally different.  They were

(by the court's description) releases for amounts "certain."  1995 U.S. Dist. LEXIS 18987, at *3.

Where an employee has released claims for a specific amount of money, one might reasonably

question whether that employee would want their litigation risk trade-off disturbed.  Here,

however, Plaintiff is seeking to recover *what the employees were promised in the release*

*agreement*.  Despite signing releases in exchange for WARN damages, they have either not

gotten them yet (in the case of RA WARN employees), or they are not expected to get them at all

(the RA NO-WARN employees).  One could reasonably expect that these employees want the

benefit of their bargain (and any class member wishing to exclude themselves from the class may

opt out of it).

**IV.    BOTH DEBTORS AND THE CLASS MEMBERS ARE BETTER SERVED BY A
        CLASS ADVERSARY THAN THE INDIVIDUAL CLAIMS PROCESS
        (NUMEROSITY, SUPERIORITY)**

On both numerosity and superiority, Defendants make an argument from a bygone era,

asserting that "individual resolution through the claims process" is "superior to the expense and

complexity of class action litigation."  (Def.'s Br. at 8, ¶18).  There was a time when this kind of

surface-level argument could be found in decisions of bankruptcy courts, which were generally

averse to class actions.  They employed it to effectively nullify the WARN claims of workers

numbering in the hundreds, *Scoggin v. In re Adam Aircraft Indus. (In re Adam Aircraft Indus.)*,

Nos. 08-11751 MER, 08-1366 MER, 2009 Bankr. LEXIS 4589, at *5 (Bankr. D. Colo. Mar. 19,

2009), or, in a then-influential decision espousing this view, even 1,000 of them.  *Binford v. First*

*Magnus Fin. Corp. (In re First Magnus Fin. Corp.)*, 403 B.R. 659, 662 (D. Ariz. 2009).

The Fifth Circuit dissolved that mantra in its WARN decision in *Teta v. Chow (In re TWL Corp.)* ("*TWL*"), 712 F.3d 886, 891 (5th Cir. 2013).  By that point, the bankruptcy courts were increasingly recognizing the obvious efficiency of a single class adversary versus the absurd expectation that "ordinary workers" would "proceed pro se in the claims process" for "a few thousand dollars in back wages." *Id*. at 904-5 (Graves, J., concurring).  The lower court in *TWL,* however, was still citing *First Magnus*.  It denied class certification based on "conclusory statement[s]" that a class adversary would be a "waste of [the debtor's] limited assets" given the availability of a "more expeditious[]" claims process.  *Id.* at 892.

The Fifth Circuit vacated that decision.  The mere existence of the claims process "fail[s] to explain" a "rationale for denying class certification." *Id*. at 893.  Rule 23 demands consideration of "the relative complexity… of adjudicating the claims." *Id.* at 897.  A mere nod to the claims process offers "no insight" into the practical effects of forcing workers to press their WARN claims individually in that process. *Id.* at 898.  While "relatively uncomplicated" claims, for clear amounts owed, may not require representation, WARN are not such claims. *Id.* Where "defenses are to be asserted, the need for attorneys both to assert the claims and to defend against them becomes greater and, in spite of the associated costs, may be important to the ability of the claimants to recover and of the debtor to defend." *Id*. at 898.

While the majority modestly vacated the decision for another look, Judge Graves' concurrence explained why no more looks were needed: by 2013, courts around the country recognized that the "class adversary proceeding is a preferable way to adjudicate WARN Act claims, as opposed to the proof of claim process." *Id.* at 902 (Graves, J., concurring) (collecting cases).  While the claims process would allow the debtor to "delay consideration" of the WARN claims, to the "detriment of the WARN Act creditors," the class adversary would be "expedited

26

and handled more efficiently." *Id.* at 903 (Graves, J., concurring) (citations and quotations omitted). Both WARN's status as a "negative value suit" and its abundant common legal issues make it widely recognized as "well-suited for class treatment." *Id.* at 903-4 (Graves, J., concurring). Indeed, "courts have recognized that treating WARN Act claims as a class adversary proceeding actually is the best way to preserves the estate's assets," because it avoids "the expense of litigating multiple proofs of claim." *Id.* at 904 (Graves, J., concurring) (collecting cases). Lastly, and perhaps most importantly, Rule 23 seeks the best method to "adjudicate[] the controversy" not only "efficiently," but "fairly." Fed. Re. Civ. P. 23(b)(3). As Judge Graves emphasized, "[w]orkers cannot be expected to proceed pro se in the claims process." *Id.* at 904-5 (Graves, J., concurring). Navigating claims, plans, and priority schemes "may be a reasonable expectation of commercial creditors, but for an ordinary worker owed a few thousand dollars in back wages, it is a formidable task." *Id.* at 905.As[17]

Defendants' RA program gets refracted through this bankruptcy, the need for unified representation is apparent. About 20% of the employees are not going to get what the RA implies. While other employees may well get their full amount, no one has yet. Instead, partial payments have landed in the employees' bank accounts, with no explanation. They have gotten letters describing priority claims (a concept unfamiliar to most non-bankruptcy practitioners) and a deadline to correct them; again, no explanation of the amounts listed. And they will soon be asked to vote on a Chapter 11 plan.

A class action to litigate what must be litigated and ensure the rest follows its due course is the superior method of fairly and efficiently adjudicating the class members' WARN claims.

---

[17] On remand, the *TWL* class was certified and the case settled.

27

## <u>CONCLUSION</u>

For the foregoing reasons, the Motion should be granted.

Dated: September 15, 2025

/s/ Jack A. Raisner
**RAISNER ROUPINIAN LLP**
Jack A. Raisner (*admitted pro hac vice*)
René S. Roupinian (*admitted pro hac vice*)
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

**HAWASH CICACK & GASTON LLP**
Walter J. Cicack
Texas Bar No. 04250535
wcicack@hcgllp.com
711 W. Alabama St., Suite 200
Houston, Texas 77006
(713) 658-9015 – tel/fax

*Attorneys for Plaintiff and the putative class*