# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
(HOUSTON DIVISION)

| | |
|---|---|
| In re:<br><br>SUNNOVA ENERGY INTERNATIONAL INC., et al.,[1]<br>Debtors, | **Chapter 11**<br>**Bankruptcy Case No. 25-90160 (ARP)**<br>**Jointly Administered** |
| ERIK WEATHERWAX, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SUNNOVA ENERGY INTERNATIONAL INC, et al.,[2]<br><br>Defendants. | **Adv. Pro. No.  25-03423 (ARP)** |

## DECLARATION OF PATRICK FRANZ

Patrick Franz hereby declares the following under penalty of perjury:

1. I was employed by Sunnova from September 2023 until my termination on May 30, 2025. My position at the time of my termination was Vice President, Software Engineering.

2. I was a remote employee and often worked from my home in California.

3. I oversaw the Software organization which, at its peak, had a headcount of around 110.

---

[1,2] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Sunnova. The location of Debtor Sunnova Energy International Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 20 East Greenway Plaza, Suite 540, Houston, Texas 77046.

1

4. The Software organization built and maintained the software which supported the company's business functions (like sales, solar installations, and customer-facing applications) as well as its internal administration (like the Enterprise Resource Planning system).

5. As VP of Software, my direct supervisor was Jake Wachman (Senior Vice President of Software Technology). Wachman frequently worked from his home in Boston, but he also had a dedicated office at the Houston headquarters. He went into the office regularly, about five days a month.

6. Wachman's direct supervisor was Paul Matthews, who was Chief Operating Officer until shortly before the bankruptcy, when he became CEO. Matthews worked out of the Houston headquarters. After Matthews' elevation to CEO (and Wachman's departure shortly thereafter), my direct supervisor became Alisha Leveston. Leveston's direct supervisor was Matthews.

7. The Software organization used the project management software Jira to track our day-to-day progress on tasks, such as software features we were working on, defects we were working to fix, and other similar tasks. Nearly all tasks in our organization had a Jira "ticket."

8. Approximately bi-weekly, I pulled metrics from Jira, New Relic (which monitored our software usage) and Salesforce (business and sales metrics) and compiled them into a report which was sent to Matthews. The report showed the organization's progress and performance in numerous areas, including:

> a. Progress on larger, top-priority projects (like major migrations of data from one system to another), who the responsible employees were, and the projected completion date for the projects;

      b.  Progress on our quarterly "roadmap" of software features we were planning to release, including any impediments to that progress and the "path to green" (ways to resolve the impediments);

      c.  Performance of various live software processes, like page load times and cycle times (how much time it took a user or employee to go through a multi-step workflow on our software); and

      d.  Productivity metrics, like how quickly we were developing software features start-to-finish.

9. Another metrics deliverable of mine was preparing a slide, on behalf of the Software organization, that was included in a weekly presentation to the C-suite. The slide showed our progress numerous items, including software defects we were working on and projections of completion times by software release.

10. I often reported information to Matthews or other C-suite managers as part of our incident management process. This process was triggered when issues arose with our software or infrastructure. Status updates and outcomes of these incidents were reported to Matthews or C-suite manager, often by me.

11. Each of the company's major organizations (or verticals) submitted similar slides in the weekly C-suite presentation. These other organizations included: Finance, Sales, Engineering, Project Management, Product Management, Energy Services, Human Resources, Public Relations/Policy.

12. A number of the other organizations within the company also used project management software to track their work. Some of the tools I was aware of were the following: The IT department used Jira (and Salesforce for employee technical issues). Human Resources

used software called Lever for job openings/hiring workflow. The Sales and Installation groups used Salesforce (and other software we developed for project management). The Finance group used our ERP software called Financial Force.

13. My organization (along with the Quality Assurance, Developer Operations, Project Management organizations) had Quarterly Business Reviews ("QBR") with C-suite managers, often in Houston. We reported on our group's work, in a few areas:

   a. Software features we were planning to release to the company;

   b. Internal software work, such as infrastructure and process improvements;

   c. A set of metrics specifically relating to a consultant group that the C-suite had brought in. The consultants made specific recommendations for the software organization, including specific metrics to use in measuring our progress toward becoming a world-class software organization. For the QBRs, we reported on the progress being made on these recommendations and current values of their recommended metrics.

14. C-suite management had regular involvement in my priority work, including in the following ways:

   a. They retained consultants for the software, IT, DevOps, and QA organizations, whose recommendations we were directed to follow and report on, as noted above.

   b. A major part of my work was negotiating major contracts with vendors. All vendor contracts above a certain amount needed C-suite approval. Most of my negotiations for third party contracts required coordination with our Vice

4

      President of Information Technology, who was based out of the Houston headquarters.

   c. One of our most visible pieces of software was the sales and quoting software. We had weekly meetings with the Chief Revenue Officer, who set the priorities for what we worked on within that software.

   d. Another high visibility piece of software was the consumer web/mobile app, which allowed consumers to monitor their solar power installations. Sunnova's founder (and until March 2025, its CEO) used the app, and when he found issues with the app, those issues would get sent to me for resolution.

   e. As part of our new software product/feature template and intake process, an Executive Sponsor, who was usually a C-suite manager, needed to authorize new business-related software features for us to work on it.

   f. In the QBRs, the C-suite managers would discuss and tell us their priorities concerning the new software products and features that had been submitted to us.

   g. When software incidents affected C-suite managers directly, they would bring those issues to Wachman, who passed them on to me for investigation and, if necessary, resolution.

   h. On a number of occasions, Matthews reached out to me directly to give me specific tasks.

15. I did not receive a WARN notice before or after my termination on May 30, 2025.

16. After my termination, I was emailed a copy of the release agreement.

17. The accompanying email stated that if I signed the agreement, I would have a priority claim of $17,150 and a general unsecured claim for "amounts owed" above that. I did not sign the agreement.

18. I later received a notice from the claims agent Kroll that I had a priority claim for $17,150 and a general unsecured claim of $158.00.

19. I am willing to represent a sub-class of remote employees who Sunnova claims did not work at a WARN-eligible site.

DATED: 9/14/2025

PATRICK FRANZ
Patrick Franz