United States Bankruptcy Court
Southern District of Texas

**ENTERED**

March 03, 2026

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 25-90160** |
| **SUNNOVA ENERGY** | § | |
| **INTERNATIONAL INC.,** *et al.,* | § | **CHAPTER 11** |
| | § | |
| Debtors. | § | |
| | § | |
| **ERIK WEATHERWAX,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 25-3423** |
| | § | |
| **SUNNOVA ENERGY** | § | |
| **INTERNATIONAL INC.,** *et al.,* | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND (RELATES TO ECF NO. 50)

## BACKGROUND

Beginning on May 30, 2025, Sunnova Energy International, Inc., and its related affiliates (collectively "Sunnova") laid off several hundred employees who worked at, reported to, or received assignments from Sunnova's facility located at 20 Greenway Plaza #540 Houston, Texas (hereinafter the "Houston Facility" or the "Facility").[1]

---

[1] The actual number of employees laid off on or around May 30, 2025, is somewhat unclear. The Court initially found the number of affected employees to be approximately 741, but further allegations made as this adversary proceeding progressed have increased that number to 861. ECF No. 40 at 1; ECF No. 42-1 at 2. The Court understands, however, that the Parties current dispute it is not necessarily about the total number of employees who experienced layoffs, but rather whether a sufficient number of employees within the laid off sample size are eligible to bring claims under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§

Sometime after the May 30, 2025, layoffs occurred, a significant portion of the employees who experienced layoffs signed a Release Agreement (hereinafter the "RA"), thereby relinquishing their rights to bring claims under the WARN Act against Sunnova in exchange for the higher of (i) severance the employee was entitled to under Sunnova's Severance Pay Plan (hereinafter the "SPP") or (ii) amounts the employee may be owed under the WARN Act.[2]

On June 8, 2025, Sunnova filed for chapter 11 bankruptcy.[3]

On June 16, 2025, Erik Weatherwax (hereinafter "Plaintiff Weatherwax") filed a Class Action Adversary Proceeding Complaint (hereinafter the "First Complaint") against Sunnova on behalf of himself and other employees who also experienced layoffs on or around May 30.[4] In the First Complaint, Plaintiff Weatherwax argued Sunnova did not give affected employees notice as required by the WARN Act.[5] On July 25, 2025, Plaintiff Weatherwax filed a Motion for Class Certification and Related Relief (hereinafter the "Motion to Certify"), seeking to certify a prospective class of 741 laid-off employees for purposes of Plaintiff Weatherwax's purported WARN Act claim.[6] Filed contemporaneously with Plaintiff Weatherwax's Motion to Certify was Plaintiff Weatherwax's Memorandum of Law in Support of Motion for Class

---

2101 *et seq.* (hereinafter the "WARN Act"). Regardless, "[t]o the extent there is any factual dispute as to the 'true mass layoff numbers,' the evidentiary support necessary to negate [the Plaintiff's] allegations would be best reviewed at the summary judgment stage." *Rodriguez v. Kaseya Holdings, Inc.*, Case No. 1:24-CV-752-DAE, 2025 WL 1154528, at *2 (W.D. Tex. Apr. 21, 2025).

[2] ECF No. 29 at 5; ECF No. at 6; ECF No. 30-1. The exact language of the RA states that in exchange for signing the RA, employees will receive "the higher of (a) the applicable severance provided for in the [SPP] or (b) the applicable amount that may be owed to such employee under [the WARN Act]." ECF No. 30-1. The RA states that an employee is only entitled to receive severance if the employee signs the RA. *Id.* If an employee signs the RA, then the employee would relinquish their right to bring a suit against Sunnova on account of alleged violations of the WARN Act. *Id.*

[3] Case No. 25-90160, ECF No. 1.

[4] ECF No. 1.

[5] *Id.*

[6] ECF No. 12; ECF No. 17.

Certification (hereinafter the "Memo in Support").[7]  In his Memo in Support, Plaintiff Weatherwax argued *inter alia* that (i) the RA was an unenforceable contract, and (ii) certain employees who signed the RA were improperly deemed WARN ineligible (hereinafter "RA NO-WARN employees") by Sunnova based on an incorrect interpretation of where those employees' "single site of employment"[8] existed for purposes of the WARN Act.  According to Plaintiff Weatherwax, certain of those RA NO-WARN employees would have received a higher applicable amount under WARN than under the SPP had they been deemed WARN eligible by Sunnova.[9]

On August 14, 2025, Sunnova filed an Answer to Plaintiff Weatherwax's First Complaint.[10]  In the Answer, Sunnova admitted that Plaintiff Weatherwax and other employees were terminated on or about May 30, 2025.[11]  Sunnova also admitted that Sunnova did not provide notice of termination to Plaintiff Weatherwax on or prior to May 30, 2025.[12]  On August 27, 2025, Sunnova filed their Memorandum of Law in Opposition to Motion for Class Certification, arguing the RA was enforceable and that their interpretation of the standard for determining a remote worker's single site of employment was the correct one.[13]  On September 15, 2025, Plaintiff Weatherwax filed a Reply.[14]

---

[7] ECF No. 12-1.

[8] 29 U.S.C. § 2101(a)(3).  "Single site of employment" is an undefined term of art used within the definition of "mass layoff" under the WARN Act.  *Id.*  In general terms, in order for there to be a mass layoff which triggers a WARN event, there must be a reduction in force of a sufficient number of employees at a single site of employment.  *Id.*  Accordingly, and as further discussed below, the standard for determining whether employees' site of employment was at a particular facility becomes important for determining whether a reduction in force there triggered WARN, and subsequently whether affected employees are WARN eligible as a result of that reduction in force.

[9] ECF No. 34, at 9.

[10] ECF No. 22.

[11] *Id.* at 2–3.

[12] *Id.* at 3.

[13] ECF No. 29.

[14] ECF No. 34.

On October 6, 2025, the Court issued an Order Requesting Additional Information on Plaintiff Weatherwax's Motion to Certify, seeking clarification as to various factual issues in the Motion to Certify and respective briefing.[15]  On October 10, 2025, the Parties filed a Joint Response to the Court's Order.[16]

On October 28, 2025, the Court denied Plaintiff Weatherwax's Motion to Certify.[17]  The Court found the RA to be an enforceable contract and determined that signing the RA prevented 728 of the signatories from asserting pure WARN Act claims against Sunnova.[18] Because those 728 employees could not assert WARN Act claims, the prospective class shrank to the remaining 13 employees who did not sign the RA.[19]  The Court found this remaining prospective class not so numerous that joinder of all members was impracticable under FED. R. CIV. P. 23(a)(1), and accordingly denied the Motion to Certify.[20]

In rendering its decision, the Court expressly did not take a position on which standard was the correct one for determining a remote worker's single site of employment for purposes of WARN.[21]  Rather, the Court explained that if Sunnova's determination of RA NO-WARN employees' WARN eligibility was indeed improper, *and* those employees' applicable WARN amounts would have been higher than amounts owed to them under the SPP, then those employees might possess a breach of contract claim under the RA.  Certification of a class based on that potential breach of contract claim, however, was not before the Court when ruling on Plaintiff Weatherwax's Motion to Certify.

On October 31, 2025, Plaintiff Weatherwax filed the Motion for Leave to File First Amended Complaint, with a copy of the First Amended Class Action Complaint attached as Exhibit 1 (hereinafter the

---

[15] ECF No. 37.
[16] ECF No. 39.
[17] ECF No. 40.
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.* at 13, n. 50.

"Amended Complaint").[22]  On November 24, 2025, the Court signed the Stipulation and Agreed Order Granting Plaintiff Leave to Amend His Complaint and Extending Defendant's Deadline to File an Answer or Responsive Pleading, which deemed the Amended Complaint as the operative complaint in the adversary proceeding.[23]

In the Amended Complaint, Plaintiff Weatherwax reduced the total prospective class size down to 198 employees who had experienced layoffs but allegedly had not yet received WARN damages from Sunnova.[24]  The Amended Complaint bifurcated the 198 prospective class members into two sub-classes.[25]

The first sub-class, represented by Adam Reed (hereinafter "Plaintiff Reed"), is comprised of approximately 185 RA NO-WARN employees who worked at, reported to, or received assignments from Sunnova's Houston Facility and were terminated without cause on or about May 30, 2025, due to the alleged mass layoff and/or plant closing ordered by Sunnova (hereinafter the "Contract Subclass").[26]  According to Plaintiff Reed, and as previously argued in the Memo in Support, the Contract Subclass members were improperly deemed WARN ineligible, and would have received a higher applicable amount under WARN than under the SPP but-for Sunnova's "fallacious" interpretation of the standard for determining those workers' single site of employment for purposes of WARN.[27]  According to Plaintiff Reed, Sunnova's failure to pay Contract Subclass members their applicable amounts owed under WARN breached the terms of the RA, thereby giving rise to a class action breach of contract claim.[28]

---

[22] ECF No. 42; ECF No. 42-1.

[23] ECF No. 48.

[24] ECF No. 42-1, at 2.  During the course of the adversary proceeding, Sunnova had purportedly been paying amounts corresponding to approximately 60 days' wages and benefits to certain affected employees within the former prospective class, effectively mooting any WARN claim they might have possessed.  *Id.*

[25] *Id.*

[26] *Id.* at 7.

[27] *Id.* at 2.

[28] *Id.* at 7.

The second sub-class, represented by Patrick Franz (hereinafter "Plaintiff Franz" and together with Plaintiff Reed and Plaintiff Weatherwax, the "Plaintiffs"), is comprised of approximately 13 employees who worked at, reported to, or received assignments from Sunnova's Houston Facility, were terminated without cause on or about May 30, 2025, due to the alleged mass layoff and/or plant closing ordered by Sunnova, and who did not sign the RA (hereinafter the "WARN Subclass").[29]   According to Plaintiff Franz, the WARN Subclass members have pure WARN act claims—rather than WARN act claims converted into contract claims, like the Contract Subclass–which remain the same as they were at the time the alleged mass layoff occurred.[30]

On December 15, 2025, Sunnova filed the above captioned Motion to Dismiss the First Amended Class Action Complaint (hereinafter the "Motion to Dismiss"), requesting this Court dismiss the adversary proceeding pursuant to FED. R. CIV. P. 12(b)(6).[31]   In its Motion to Dismiss, Sunnova argue the standard the Plaintiffs relied on to allege both Subclass members' single site of employment was incorrect as a matter of law, and that the Plaintiffs failed in general to allege a single site of employment as required by the WARN Act.[32]   Sunnova also argue that Plaintiffs failed to allege facts that could bring purported remote workers of either Subclass within the purview of a regulatory exception used for determining certain types of workers' single site of employment.[33]   Therefore, according to Sunnova, because the Plaintiffs have not and could not plausibly allege a WARN eligible event occurred with respect to either Subclass, the Amended Complaint failed to state a claim upon which relief may be granted and dismissal is warranted.[34]

---

[29] *Id.* at 6–7.
[30] *Id.* at 3.
[31] ECF No. 50.
[32] *Id.* at 2, 14–15.
[33] *Id.* at 13–14.
[34] *Id.* at 17.

On January 5, 2026, the Plaintiffs filed a Response in Opposition to the Motion to Dismiss.[35]   On January 12, 2026, Sunnova filed a Reply.[36]

On February 5, 2025, the Court heard argument on the Motion to Dismiss and took the matter under advisement.[37]

## JURISDICTION

28 U.S.C. § 1334(a) provides the District Courts with jurisdiction over this proceeding.   28 U.S.C. § 157(b)(1) states that "Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." This proceeding has been referred to this Court under General Order 2012-6 (May 24, 2012).  This Court has jurisdiction in this proceeding as it is a core proceeding which the Court can consider under 28 U.S.C. §§ 157(b)(2)(A), (B), and (O).   The Court has constitutional authority to enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486––87 (2011).  And venue is proper under 28 U.S.C. §§ 1408 and 1409.

## LEGAL STANDARD

To avoid dismissal under Rule 12(b)(6), the plaintiff must plead sufficient factual matter to state a claim for relief that is plausible on its face when accepting that factual matter as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

---

[35] ECF No. 51.
[36] ECF No. 52.
[37] ECF No. 56.

In reviewing such motions, the Court "accept[s] all well-pleaded facts as true and view[s] those facts in the light most favorable to the plaintiffs." *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007). "[D]etailed factual allegations are not required at the pleading stage." *Kelson v. Clark*, 1 F.4th 411, 418 (5th Cir. 2021). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," however, "do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## DISCUSSION

### I.   THE WARN ACT.

"A valid WARN Act claim requires the presence of the following three elements: '(i) a mass layoff [or plant closing as defined by the statute] conducted by (ii) an employer who fired employees (iii) who, pursuant to WARN, are entitled notice.'" *Rodriguez*, 2025 WL 1154528, at *2 (quoting *Sides v. Macon Cnty. Greyhound Park, Inc.*, 725 F.3d 1276, 1281 (11th Cir. 2013)); 29 U.S.C. § 2102(a). A "mass layoff" is defined as "a reduction in force . . . which results in an employment loss at the single site of employment during any 30-day period for—at least 33 percent of the employees (excluding any part-time employees) [totaling] at least 50 employees []; or at least 500 employees (excluding any part-time employees)." 29 U.S.C. § 2101(a)(3). A "plant closing" is defined as

> the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees[.]

29 U.S.C. § 2101(a)(2). Therefore, in order for there to be a mass layoff or plant closing within the meaning of the statute, each of the employees aggregated to the requisite threshold amount necessary to trigger a WARN event must all have had a single site of employment at the location where the reduction in force occurred.

The WARN Act does not define "single site of employment." 29 U.S.C. §§ 2101–2109. Regulations promulgated by the Department of Labor, however, provide guidance as what constitutes employees' single site of employment for purposes of WARN, as well as how to determine that single site under certain circumstances in the context of certain types of workers. 29 C.F.R. § 693.3(i). Relevant to the current dispute is subpart six of 29 C.F.R. § 693.3(i) (hereinafter "Subpart Six"), which provides

> [f]or workers [i] whose primary duties require travel from point to point, [ii] who are outstationed, or [iii] whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment [A] to which they are assigned as their home base, [B] from which their work is assigned, or [C] to which they report will be the single site in which they are covered for WARN purposes.

29 C.F.R. § 693.3(i)(6).

As the Plaintiffs correctly point out in their briefing, the subject of Subpart Six categorizes three types of workers the exception applies to: (i) those whose primary duties require travel from point to point, (ii) those who are outstationed, or (iii) those whose primary duties involve work outside any of the employer's regular employment sites. *Id.* If a worker falls within one of the three inter-part clauses laid out in the former portion of Subpart Six, then their single site of employment for purposes of WARN may correspond to one of the three categories within the latter portion of the regulation: (A) the single site where their home base is, (B) the single site from which their work is assigned, or (C) the single site to which they report. *Id.*

## II.   WHETHER SUBPART SIX APPLIES TO REMOTE WORKERS.

Sunnova is correct that for purposes of this adversary proceeding, WARN eligibility is a necessary predicate for both the WARN Subclass

and the Contract Subclass.[38]  In their Response to the Motion to Dismiss, the Plaintiffs argue the Amended Complaint pleads a WARN claim that is plausible on its face.[39]  According to the Plaintiffs, the Amended Complaint alleges that (i) on or about May 30, 2025, a mass layoff occurred at the Houston Facility within the meaning of WARN, (ii) the Plaintiffs, including Weatherwax, Franz, and Reed, and other prospective members of both Subclasses were terminated by Sunnova, and (iii) the Plaintiffs and other Subclass members were entitled to WARN notice because they were employees of the Houston Facility (in that they received assignments from and reported to the Houston Facility, or worked there) who were terminated as a result of the alleged mass layoff at the Houston Facility.[40]

For purposes of the instant Motion to Dismiss, the Court is required to accept certain of these allegations as true.  *Stokes*, 498 F.3d at 484.  For example, whether the Plaintiffs can prove that any of the employees in either Subclass reported to, or received assignments from the Houston Facility within the meaning of Subpart Six is a merits question that is not before the Court today.  The Court must, however, determine whether the Plaintiffs plausibly alleged a mass layoff beyond mere conclusory allegations.  *Iqbal*, 556 U.S. at 678.  As described above, whether a mass layoff occurred is contingent on whether the requisite number of employees laid off during the May 30, 2025, reduction in force had a single site of employment at the Houston Facility.  29 U.S.C. § 2101(a)(3).

In their Response to the Motion to Dismiss, the Plaintiffs argue that certain remote workers within either Subclass fall into one of the three inter-part clauses in Subpart Six, and that because of this, their single site of employment necessarily corresponds with where they report to and/or receive assignments from.  Plaintiffs contend that this single site is Sunnova's Houston Facility.  Accordingly, in order for the

---

[38] ECF No. 50, at 9.
[39] ECF No. 51, at 5.
[40] *Id.*

Plaintiffs' purported WARN Act and contract claims to appear plausible on their faces, the Court must necessarily make a preliminary determination as to whether remote workers fall within one of the three inter-part clauses in Subpart Six.  Stated another way, for purposes of this Motion to Dismiss, the Court is faced with one very narrow question: whether Subpart Six applies to remote workers.  In the Court's view, the answer to that question is yes.

This Court has previously stated that remote workers are "undoubtedly" covered by the text of Subpart Six.  *Hanlon v. Party City Holdco Inc. (In re Party City Holdco Inc.)*, Case No. 24-90621, 2025 WL 1888172, at *6 (Bankr. S.D. Tex. July 8, 2025) (quoting *Hoover v. Drivetrain LLC*, Case No. 20-50966, 2022 WL 3581103, at *4 (Bankr. D. Del. Aug. 19, 2022)).  Sunnova is correct that *In re Party City* was decided at the class certification stage, and that the named plaintiff in that case worked physically at the site of employment at issue.  *Id.* at *4.  The Court therefore takes this opportunity to further explain its *dicta* statement in *In re Party City* with respect to remote workers and Subpart Six.

The Court's statutory interpretation "begins and, if possible, ends with the language of the statute." *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013) (citing *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004)).

Category one of Subpart Six applies to workers "whose primary duties require travel from point to point."  29 C.F.R. § 693.3(i)(6).  The typical remote worker is not required to travel from point to point, nor do the Plaintiffs contend category one applies to them.  Category two applies to workers "who are outstationed."  29 C.F.R. § 693.3(i)(6).  This category also does not accurately encapsulate a remote worker, as remote workers can theoretically work from wherever they open their laptop.  They are not outstationed to a particular location within the meaning of the regulation.  *Bader v. N. Line Layers, Inc.*, 503 F.3d 813, 819 (9th Cir. 2007) ("The term [outstationed] most logically connotes a situation where employees live for a short period of time at a certain

site, departing for home when the work is done."). This leaves the broader third category of workers "whose primary duties involve work outside any of the employer's regular employment sites." 29 C.F.R. § 693.3(i)(6).

A remote worker by definition is one who is generally required to work from a location that is outside of the employer's regular employment sites. That particular location may be her home, a library, a coffee shop, *et cetera*, but regardless, that location is generally *not* within the employer's regular employment sites. Stated another way, while the primary duties of that remote employee would typically remain a question of fact for trial, a remote employee is a kind of worker who typically performs those duties—if any—outside any of the employer's regular employment sites. Whether the location the remote worker performs those primary duties is in fact outside any of the employer's regular employment sites would also remain a factual issue that must be proven at trial in order for the remote worker to prove she had a single site of employment at a given location. Nonetheless, based on the plain language of Subpart Six, were a prospective plaintiff to plead that she was a remote worker whose primary duties involved work outside any of her employer's regular employment sites, and that therefore her single site of employment corresponded with either (i) her home base, (ii) the site from which her work was assigned, or (iii) the site from which she reported to, the Court would be required to accept those allegations as true for purposes of arguing that a mass layoff or plant closing took place within the meaning of the WARN Act. 29 C.F.R. § 693.3(i)(6).

To avoid this outcome, Sunnova attempts to invoke *esjudem generis*, the familiar canon of statutory interpretation that courts "interpret a 'general or collective term' at the end of a list of specific items in light of any 'common attribute[s]' shared by the specific items." *Bissonnette et al., v. LePage Bakeries Park St., LLC, et al.*, 601 U.S. 246, 252 (2024) (citing *Southwest Airlines Co. v. Saxon*, 596 U.S., 450, 458 (2022); *Circuit City Stores, Inc., v. Adams,* 532 U.S. 105, 115 (2001)).

Sunnova argues that the third category of Subpart Six "is a general, residual [category] following a more specific list of mobile workers, *i.e.*, those 'whose primary duties require travel from point to point,' or 'who are outstationed.'"[41]   According to Sunnova, the third category "should be 'controlled and defined by reference to the enumerated categories of workers which are recited just before it'" which would lead to the result that category three is "limit[ed] [] to mobile workers."[42]

This undeveloped interpretation *esjudem generis* unjustifiably presupposes a mobility linkage between the three categories of workers that are the subject of Subpart Six.   As shown by the United States Supreme Court's analysis in *Circuit City*, a court's application of the *esjudem generis* canon of statutory interpretation is defined by that court's conclusion as to the linkage underlying those specific items within the list.   *See* 532 U.S. at 115, 118–119, 121 (concluding the "linkage" between "seamen" and "railroad employees" is that they are both transportation workers and therefore interpreting the residual clause in the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* to be limited to such a class of workers in the same way).   In order to invoke *esjudem generis* here, Sunnova was required to convince the Court that Subpart Six is limited to workers who are mobile, or those whose job requires mobility.   But Sunnova has not done so.

In support of the proposition that Subpart Six only applies to mobile workers—thereby excluding remote workers—Sunnova cites to commentary published by the Department of Labor explaining a revision that was made to the definition of single site of employment cabined in 29 C.F.R. § 639.3(i).   The comment provides

> Another commenter suggested that in the railroad industry certain maintenance crews have no home base and should be treated as separate operating units.   While such workers may well be considered as a separate operating unit, their status must be determined in terms of the single site of

---

[41] ECF No. 52 at 7.

[42] *Id.*

employment to which they are assigned.  These workers
may not have an assigned home base, but they must get
their orders or assignments from somewhere, even if that
place changes from time to time.  In order to cover this
situation and the situation of outstationed workers and
traveling workers who report to but do not work out of a
particular office, *that part of the regulation [(Subpart Six)]
relating to mobile workers* has been revised to clarify that
*such workers* should be treated as [A] assigned to their
home base or [B] to the single site from which their work is
assigned or [C] to which they report.  This part of the
definition has been moved, for reasons of organizational
clarity, to be a part of the definition of "single site of
employment" in § 639.3(i).

Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16,042,
16051 (Apr. 20, 1989) (emphasis added) [hereinafter the "DOL
Commentary"].

In simple terms, the fact that the DOL Commentary characterizes
Subpart Six as relating to mobile workers does not necessarily preclude
that regulation from also extending to remote workers.  Read literally,
the DOL Commentary is a statement about a revision that was made to
Subpart Six, and in that statement the DOL refers to Subpart Six as a
regulation relating to mobile workers.  If the DOL Commentary was
meant to stand for the proposition that Subpart Six only applies to
mobile workers, and no one else can fall within the ambit of the
regulation despite otherwise fitting within the definitions provided
there, the DOL Commentary could have clarified as such.  It did not.

Sunnova takes the words "relating to mobile workers" and runs
to the overbroad conclusion that Subpart Six *only* applies to mobile
workers and therefore is necessarily precluded from applying to a
remote worker.  If it was the intent of Congress to extend WARN
coverage to truly mobile workers while carving out remote workers from
the Act's protection, then the legislature would have drafted WARN to
reflect such.  *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004)
("The preeminent canon of statutory interpretation requires [the court]

'to presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, (1992)).  It did not.  Nor is the DOL Commentary binding authority on the matter.

Nor is the Court convinced by the reasoning applied in *Meson v. GATX Technology Services, Corp.*  507 F.3d 803, 808–10 (4th Cir. 2007). There, the United States Court of Appeals for the Fourth Circuit held that Subpart Six was intended to apply only to "truly mobile workers without a regular, fixed place of work." *Id.* at 809.  The court interpreted the terms "travel . . . from point to point," "outstationed," and "home base," as "all connot[ing] the absence of a fixed workplace." *See id.* (citing *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 146 (3d Cir. 1998) (defining "home base" as "a site that the employee visits during the course of a typical business trip"); *Bader*, 503 F.3d at 819).  The court found the types of workers listed in the explanatory parenthetical to category three of Subpart Six as describing workers who have "no fixed workplace or office" and whose jobs are "characterized by travel and mobility" (in the case of bus drivers and railroad workers), or workers who primarily work out of their homes or cars (in the case of traveling salespersons). *Id.*  The court also stated "the [DOL Commentary] explains that [S]ubpart [Six] was included in the definition of "'single site of employment" . . . [i]n order to cover [the situation of railroad industry maintenance crews who have no home base] and the situation of outstationed workers and traveling workers who report to but *do not work out of a particular office . . . .*'" *Id.* at 809–10 (original emphasis) (citing DOL Commentary, at 16051).

This Court declines to adopt such a preclusive reading of the regulation, nor does this Court's reading of the DOL Commentary lead to such a conclusion.  In this Court's view, the DOL Commentary merely states that Subpart Six was revised to clarify the determination of a worker's single site of employment where (i) "[that worker] may not have an assigned home base, but [nonetheless] gets orders and assignments from somewhere, even if that place changes from time to time," (ii) "the

situation of outstationed workers," and (iii) "traveling workers who report to but do not work out of a particular office." DOL Commentary, at 16051. While each of these three situations can have potential similarities read between them, the text of category three of Subpart Six (*i.e.*, relating to the worker "whose primary duties involve work outside any of the employer's regular employment sites"), contemplates a broader application than that limited only to workers who lack a fixed place of work and are "truly mobile." In the Court's view, there is no necessity nor requirement to read a mobility requirement or lack-of-fixed-workplace requirement into Subpart Six under the language of the DOL Commentary. Rather, the analysis in *Meson* creates a "mobility" requirement which the court imposes on category three, limiting the type of worker contemplated by the text of regulation.

By way of example, *Meson* characterizes a traveling salesperson as not having a fixed office—therefore purportedly falling within Subpart Six—despite the possibility that said traveling salesperson might "[work primarily out of their] home" (while presumably traveling from location to location to perform their duties). 507 F.3d at 809. Here too, the Plaintiffs correctly point out that a remote worker may primarily work out of their home, but also necessarily does *not* work out of their employer's regular employment site when performing their duties, such as writing code. Under the same logic justifying inclusion of a traveling salesperson who works out of their home but "lacks a fixed office," a remote worker might also be included within the purview of Subpart Six because a remote worker may work primarily out of their home, but, according to circumstance, may also lack a fixed office due to their work-permitted mobility. This comparison highlights what appears to be the distinction underlying *Meson*: job-permitted versus job-mandated mobility. But that test is not enumerated anywhere in the text of the WARN Act, nor in the text of Subpart Six.

Rather than risk adopting some contrary rule that might lead to inconclusive or inconsistent results, this Court instead chooses to abide by the text of the regulation. In this Court's view, remote workers fall

within the text of category three. Such a reading would not extend
Subpart Six to "cover almost any employee who leaves her office" as
*Meson* suggests.  *Id.*  Rather, this reading ensures that the WARN Act
covers those whom the regulation expressly defines within ambit of
WARN protection: those "whose primary duties involve work outside
any of the employer's regular employment sites."  29 C.F.R. § 639.3(i)(6).

Sunnova's interpretation of the regulation is, in the Court's view,
too narrow.  This Court does not read category three as only applying
"when the nature of the job itself . . . makes it impossible to assign the
worker to any stable location."[43]  The regulation does not say that.  The
difference between falling in and out of category three is not about
"imposed" mobility required for jobs like a railroad worker, bus driver,
or traveling salesperson, and "permitted" flexibility granted to remote
workers, as Sunnova suggests.[44]  There is no such test enumerated in
the text of the WARN Act or Subpart Six, nor does Sunnova cite to any
authority for that proposition.  29 U.S.C. §§ 2101–2109; 29 C.F.R. §
639.3(i)(6). Sunnova's *Meson*-like characterization that a remote worker
has a "fixed and identifiable" site of employment at their home[45] does
not serve as a workaround to the plain language of the regulation which
includes such workers as those "whose primary duties involve work
outside any of the employer's regular employment sites."  29 C.F.R. §
639.3(i)(6).

Sunnova's argument with respect to the doctrine of last
antecedent also fails.[46]   Under the doctrine of last antecedent, "a
pronoun, relative pronoun, or demonstrative adjective generally refers
to the nearest reasonable antecedent."  ANTONIN SCALIA & BRIAN A.
GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 144
(2012). Stated another way, "qualifying words, phrases, and clauses are
to be applied to the words of phrases immediately preceding, and are not

---

[43] ECF No. 52, at 8.
[44] *Id.* at 9.
[45] *Id.*
[46] *Id.* at 7–8.

to be construed as extended to or including others more remote." *U.S. v. Campbell*, 49 F.3d 1079, 1086 (5th Cir. 1995).

The explanatory parenthetical following the third category contains the initial phrase *exempli gratia*, which suggests that the parenthetical was meant merely to provide a non-exhaustive list of examples under which category three is meant to include. 29 C.F.R. § 639.3(i)(6). The doctrine of last antecedent mandates that the qualifying parenthetical applies to the third category, meaning that "railroad workers, bus drivers, [and] salespersons" are considered as employees "whose primary duties involve work outside any of the employer's regular employment sites." That rule does not mandate, despite what Sunnova seems to suggest, that this qualifier swallows the third category. The doctrine prevents the explanatory parenthetical from applying to categories one and two, rather than curtailing the types of workers contained within category three. Sunnova invokes the doctrine in the wrong manner.

Moreover, Sunnova's doctrine of last antecedent argument sounds in their *esjudem generis* argument, while similarly suffering from the same deficiency. Sunnova presupposes that the third category is limited to a certain kind of worker whose job requires mobility, rather than some other common linkage between the three types of workers enumerated in the explanatory parenthetical following the third category. Outside of *Meson* and the non-authoritative DOL Commentary, what is to say that said hypothetical common linkage is not "workers whose single site of employment is unclear because their 'primary duties involve work outside any of the employer's regular employment sites'" (*i.e.*, what the regulation states verbatim)? 29 C.F.R. § 693.3(i)(6). Under such a reading of category three, one could conclude that because "remote" work within the context of a remote employee necessarily connotates primary duties involving work outside of the employer's regular employment sites (*e.g.*, a remote worker's home, a coffee shop, a public library), that remote workers fall within Subpart Six.

18 / 30

### B.    Case Law is Unavailing on Either Side.

In the Court's view, none of the other cases discussed in the Parties respective briefing on the Motion to Dismiss are availing on the issue of whether Subpart Six applied to remote workers.[47]

Sunnova cites *Bader v. Northern Line Layers* and other cases[48] for the proposition that the purpose of the WARN Act was to provide workers and the local community with advanced notice of an upcoming mass layoff "so [] workers can prepare to seek alternative employment and communities can prepare for the economic disruption of a mass layoff."  503 F.3d at 817.  This may be true, but the WARN Act's purpose is not dispositive on this Court's current inquiry.  Indeed, assuming this Court was guided by WARN's purpose at protecting local communities from economic disruption, would the result here be any different if 50 remote workers, each of whom lived in Pasadena, California, were all laid off during a reduction in force at a software company headquartered in downtown Pasadena?  Common sense dictates no.  The practical reality of how ubiquitous and pervasive remote work is in our communities also dictates no.

Both Parties discuss *Piron v. General Dynamics Information Technology, Inc.*, where the United States District Court for the Eastern District of Virginia dismissed a putative WARN class action without prejudice on grounds that the complaint there did not contain factual allegations that plausibly stated the putative plaintiffs met the *Meson* standard for Subpart Six.  Case No. 3:19-cv-709, 2020 WL 1159383, at *4 (E.D. Va. Mar. 10, 2020) [hereinafter "*Piron I*"].  The *Piron I* court held the "mere conclusory allegations that [p]laintiffs worked remotely or worked at a particular location do not meet [the *Meson* standard]" that was binding authority in that jurisdiction.  *Id.*  The court, however, permitted the putative plaintiffs to file a second amended complaint

---

[47] *See* ECF No. 50; ECF No. 51; ECF No. 52.
[48] *Teamsters Local Union 413 v. Driver's Inc.*, 101 F.3d 1107, 1109 (6th Cir. 1996); *In re James Corp.*, Case No. 96-8389, 1997 WL 327105, at *16 (Bankr. S.D.N.Y. June 11, 1997); *see also* DOL Commentary, 16060 (Apr. 20, 1989).

because their briefs and the argument of their counsel "disclosed the possibility that there are facts that have not been pleaded that would permit the crafting of a complaint that would meet the requirements of *Meson*, *Twombly*, and *Iqbal*." *Id.*

The putative plaintiffs in *Piron I* would later file a second amended complaint which was then met with a second motion to dismiss. [49] In the second amended complaint, the putative plaintiffs provided allegations regarding certain plaintiffs' job-related travel duties.[50] The second amended complaint also pleaded allegations that other plaintiffs simply "worked remotely."[51] The court denied the second motion to dismiss on grounds that the "[s]econd [a]mended [c]omplaint allege[d] facts from which it plausibly could be held that the plaintiffs and class members fit within the so-called 'mobile worker' category [in *Meson*] . . . ."[52] The order denying the second motion to dismiss was short and did not provide any analysis or differentiation between allegations regarding traveling workers and allegations regarding remote workers under *Meson*, *Twombly*, and *Iqbal*.[53] The court did, however, note that "further development of the record [may] necessitate a different conclusion" with respect to whether class members fit within the mobile worker exception "at the end of discovery."[54]

Later, the United States District Court for the Eastern District of Virginia certified the putative plaintiffs' class for purposes of their purported WARN Act claims. *Piron v. Gen. Dynamics Info. Tech., Inc.*, Case No. 3:19CV709, 2022 WL 363958, at *3 (E.D. Va. Feb. 7, 2022) [hereinafter "*Piron II*"]. In granting class certification, the court declined to engage in a full merits-based discussion of whether the

---

[49] Case No. 3:19CV709, Second Amended Complaint, ECF No. 39 (Apr. 27, 2020).

[50] *Id.*

[51] *Id.*

[52] Case No. 3:19CV709, Order Denying Motion to Dismiss Second Amended Complaint, ECF No. 50 (June 2, 2021).

[53] *Id.*

[54] *Id.*

putative plaintiffs could prove a single site of employment under Subpart Six and *Meson*, stating

> "the Fourth Circuit has not provided specific guidance regarding which standard a district court should use to evaluate single employer status under the WARN Act." [] Accordingly, the contention that Plaintiffs cannot prove a WARN Act claim due to lack of a single site of employment "is properly addressed at trial or in a ruling on a summary judgment motion. The allegation should not be resolved in deciding whether to certify a proposed class." []

*Id.* at *13 (internal citations omitted).  The parties in *Piron II* would later settle the issue, and in Memorandum of Law in Support of the Joint Motion for Final Approval of Settlement (hereinafter the "Settlement Memo"), the putative plaintiffs admitted they "still must prove they were 'truly mobile workers' under applicable WARN regulations as interpreted by the Fourth Circuit in *Meson*[.]"[55]  The putative plaintiffs also admitted that "class members' job positions varied, as did the amounts they travelled, which may hinder their sustaining *Meson*'s standard for mobility."[56]

Neither *Piron I* and *Piron II* are helpful to this Court in rendering its decision.  First, the court in those cases was bound by *Meson* as authoritative precedent.  This Court is not similarly bound.  Second, neither *Piron* decision, nor the order denying the second motion to dismiss provided clear guidance on whether a remote worker falls within Subpart Six despite the court in those instances being bound by *Meson*. Rather, the *Piron I* court rendered its decision based on a pleading deficiency regarding whether alleged class members fit within Subpart Six *at all*—*not* that remote workers did not fall within the regulation under *Meson* as a matter of law.  *Piron I*, 2020 WL 1159383 at *4.  The *Piron II* court expressly reserved judgment on that merits-based question and was unable to answer it prior to settlement.  *Piron II*, 2922

---

[55] Case No. 3:19CV709, Memorandum in Support of Joint Motion for Final Approval of a Settlement, ECF No. 109 (Sept. 16, 2022).

[56] *Id.*

WL 363958 at *13. As noted above, the order denying the second amended complaint did not differentiate between remote and traveling employees when holding the second amended complaint sufficiently plead Subpart Six,[57] nor did the *Piron II* court provide any clarifying guidance on its prior decision cabined in that order.

The Parties also discuss *In re Storehouse, Inc.* in the respective briefing. Case No. 06-11144-SSM, 2010 WL 4453849 (Bankr. E.D. Va. Nov. 3, 2010). Much like *Piron II*, this Court finds *In re Storehouse* of little help in resolving the current dispute because there, the court also expressly reserved judgment on the Subpart Six question in the context of remote workers, stating

> This [case] should not . . . be considered an opinion on all situations involving telecommuters [for purposes of WARN]. For instance, this court considers it an open question as to whether or not the WARN Act would apply if a "virtual" call center of more than 50 employees were closed if the employees all worked from home and all lived in the same economic community.

*Id.* at *4, n. 3.

The Parties also dispute the effect of *Karroll v. Car Toys, Inc.*, another Fourth Circuit case interpreting Subpart Six under *Meson*. 765 F.Supp.3d 506 (D.S.C. 2025). There, the field employee-plaintiff attempted to argue he was entitled to WARN protection based on allegations he was a remote employee of the defendant's Seattle, Washington headquarters. *Id.* at 521–22. The plaintiff alleged that his primary job duties required travel between the defendant's regional kiosks to cover shifts, that he was assigned work from the Seattle headquarters, and that his performance was reviewed by employees stationed in Seattle. *Id.* at 521. According to the plaintiff, his asserted factual allegations "plead that the primary duties of [f]ield [e]mployees [such as himself] required travel from point to point because of their

---

[57] Case No. 3:19CV709, Order Denying Motion to Dismiss Second Amended Complaint, ECF No. 50 (June 2, 2021).

frequent rotations to provide coverage[,] and because of this they were like 'traveling salesmen.'" *Id.* at 522.   The *Karroll* court was unconvinced the plaintiff plead sufficient non-conclusory allegations that kiosk workers like himself were "truly mobile workers without a regular, fixed place of work" under *Meson*. *Id.*

This Court finds *Karroll* unhelpful in resolving the current dispute.   First, similar to the *Piron* cases, this Court is not bound by *Meson*, and therefore the "truly mobile," "fixed workplace" analysis the *Karroll* court applied in that case is not relevant here.   *Id.* at 522. Indeed, between the lack of pleadings regarding duty-imposed travel to different kiosks, and the potential[58] existence of a regular, fixed place of work at each of the kiosks field employees were required to rotate to, it is somewhat unclear from *Karroll* whether either or both of these factors were dispositive to the court when ruling on the defendant's motion to dismiss.

Second, the *Karroll* plaintiff was attempting to place kiosk field workers like himself within category one of Subpart Six—the category that expressly mandates that workers' primary duties require travel from point to point. *Id.* at 521–22; 20 C.F.R. § 639.3(i)(6).   It is therefore not surprising the *Karroll* court dismissed the plaintiff's complaint when he failed to sufficiently plead non-conclusory allegations that his primary duties required travel between the kiosks.   765 F.Supp.3d at 522.   Here, however, the Plaintiffs are arguing category three of Subpart Six which notably does not mandate that workers' primary duties require travel, but rather mandates that workers' primary duties be "outside any of the employer's regular employment sites."   20 C.F.R. § 639.3(i)(6).

The remaining cases the Parties argue over each are unpersuasive but warrant a more truncated discussion.   With respect to

---

[58] The *Karroll* court did not necessarily hold the plaintiff field worker had a fixed place of work at each of the kiosks he rotated between, but rather that he failed "*to plead* that kiosk workers like [p]laintiff were 'truly mobile workers without a regular, fixed place of work' under *Meson*. *Id.* (emphasis added).

*Kephart v. Data Systems Int'l, Inc.*, that case was decided on a summary judgment motion, involving allegedly outstationed employees who worked from home or regional offices but were managed by supervisors located at the employer's headquarters, travelled there, had telephone extensions there, had access to computer systems located there, and received staff support from there. 243 F.Supp.2d 1205, 1223 (D. Kan. 2003). The Plaintiffs here have not alleged any similar facts regarding putative class members' relationship with the Houston Facility, but merely that workers within either Subclass reported to and/or received assignments from the Facility. Moreover, with respect to Subpart Six, the *Kephart* court applied a bifurcated analysis which first analyzed whether non-contiguous sites could be combined into a single site of employment—taking into account proximity and contiguity—and second analyzed "operational, managerial, and labor" variables as required by binding precedent in that circuit. *Id.* at 1221–23; *see also Frymire v. Ampex Corp.*, 61 F.3d 757, 766–67 (10th Cir. 1995). The focus of this case is not on the contiguity analysis with respect to single site, but rather whether a remote worker can appropriately be considered one whose primary duties are outside the employer's regular employment sites within the meaning of Subpart Six.[59]

With respect to *Harbert v. Healthcare Servs. Group*, that case was decided under the Family Medical Leave Act (hereinafter the "FMLA"), not WARN. 391 F.3d 1140, 1152 (10th Cir. 2004). While the *Harbert*

---

[59] The Parties also discuss *Gray v. Oracle Corp.*, where the United States District Court for the District of Utah denied a defendant's motion to dismiss a pro se plaintiff's WARN Act claim, rejecting the argument that "where an employee works from a home office, he or she has a fixed place of work." Case No. 2:05-CV-534-TS, 2005 WL 3132344, at *1 (D. Utah Nov. 22, 2005). That case, however, was in part based on *Kephart*, the analysis of which this Court declines to adopt. *Id.* at *2, n. 13. Second, the *Gray* court applied a rule for *pro se* pleadings that such complaints be read liberally. *Id.* at *2. The Plaintiffs here are not proceeding *pro se*. Third, the *Gray* court applied the "no set of facts" standard in ruling on the defendant's motion to dismiss under Rule 12(b)(6). *Id.* at *1. The "no set of facts" standard was abrogated by *Twombly*, two years after *Gray* was decided. *Bell Atlantic Corp. v. Twombly,* 550 U.S. at 561–63. Accordingly, this Court does not find *Gray* helpful or persuasive with respect to the current dispute.

court found the FMLA's concept of "worksite" potentially analogous to WARN's concept of single site of employment, the court ultimately found Subpart Six provided "little, if any, guidance [] with respect to the proper definition of 'worksite'" for the type of employee the court was faced there: one who, although "arguably 'outstationed,' [did] have a fixed place of work." *Id.* at 1153. As the Plaintiffs correctly point out, however, this Court is not faced with the somewhat unique situation of an off-site employee who, nevertheless has a "fixed" workplace somewhere as was the court in *Harbert*. *Id.* Rather, the members of either Subclass were purportedly permitted to work anywhere they chose, according to the Plaintiffs. Subclass members' workplace was not necessarily fixed to one particular location, despite how often they might work from there. Amendments to the FMLA Regulations made subsequent to *Harbert* provide that "employees who work at home as under the concept of flexiplace or telecommuting" can satisfy the FMLA's 'worksite' requirement." 29 C.F.R. § 825.111(a)(2). This Court is not convinced by Sunnova's argument, however, that the DOL's decision to amend the FMLA Regulations indicates an absence of intention to extend Subpart Six to remote workers in similar manner.

With respect to *Rodriguez v. Kaseya Holdings, Inc.*, the court there did not provide an analysis or express ruling on whether Subpart Six applies to remote employees. Case No. 1-24-CV-752-DAE, 2025 WL 1356397, at *4-5 (W.D. Tex. Mar. 31, 2025). Rather, the *Rodriguez* court focused its analysis on the latter portion of Subpart Six: *i.e.*, whether the relevant outstationed worker's single site was at "[their assigned] home base, [the site] from which their work [was] assigned, or [the site] to which they report." *Id.* at *4; 20 C.F.R. § 639.3(i)(6). Here, the Plaintiffs have plead that Subclass members reported to and/or received assignments from the Houston Facility, which the Court must take as true for purposes of this Motion to Dismiss; litigating that issue must be left to trial and is not before the Court today.

With respect to *Voisin v. Axxis Drilling, Inc.*, the oil rig worker-plaintiffs there attempted to invoke category one of Subpart Six, arguing

their primary duties on board a mobile oil rig required them to travel. 141 F. Supp. 3d 670, 674–75 (E.D. La. 2015). The *Voisin* court rejected the plaintiffs' argument, reasoning

> the purpose of a drilling rig is not to move people or cargo from point to point. [The defendant's] rigs were not even self-propelled. The rig employees only traveled to and from the oil rigs. They reported to their assigned rig for their shifts and drove their vehicles from the designated dock to their homes when their shifts were over. The rig employees only reported for work at the Houma office if their assigned rig was temporarily stacked there. Even then, the rig manager assigned work to the rig employees, all of whom continued to live and sleep on the rig. While the rig managers and drillers communicated frequently with the operations manager at the Houma office, the evidence shows that daily work assignments for the rig employees were delegated onboard the rig.

*Id.* at 675. This Court views *Voisin* as a category one case and a fixed place of employment case—this case is neither of those. *Id.*

Finally with respect to *Schmidt v. FCI Enterprises*, that case involved admittedly mobile employees who "travelled across the United States" to perform their job duties. Case No. 118-CV-01472-RDAJFA, 2019 WL 5748952, at *4 (E.D. Va. Nov. 5, 2019), rev'd on other grounds, 3 F.4d 95, 104 n.7 (4th Cir. 2021). The Plaintiffs here are not similarly mobile compared to the employees in *Schmidt*, nor did that case provide a substantive discussion of the applicability of Subpart Six.

In sum, the Court's review of the case law discussed by both Parties indicates there is no other persuasive or availing authority outside of *Meson* upon which this Court may rest its decision. Instead, the Court's decision rests on the plain meaning of the text of Subpart Six and the WARN Act, which, in the Court's view, state that remote employees whose primary duties involve work outside of their employer's regular employment sites could conceivably have a single site

of employment where they report to or receive assignments from, rather than their home.

### C.   The Amended Complaint's Factual Allegations Remain Deficient, but Leave to Amend is Warranted.

The Amended Complaint simply pleads that employees within the Contract and WARN Subclasses report to and/or receive assignments from the Houston Facility.[60]  As stated above, this is a merits question that must be litigated at trial, but which the Court must accept as true for purposes of the instant Motion to Dismiss.  *Stokes*, 498 F.3d at 484.  In order to fit within category three of Subpart Six, however, this Court's analysis has shown that the Plaintiffs must plead sufficient factual material to allow for the reasonable inference that the named Plaintiffs and the Subclass members they represent perform their primary duties outside of Sunnova's regular employment sites.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  The Amended Complaint does not plead anything about where Plaintiff Franz, Plaintiff Reed, or members of either Subclass performed their work duties.[61]

One could infer—as was argued in the papers with respect to the Motion to Dismiss—that because a remote worker necessarily works outside of the employer's regular employment sites, simply pleading that a putative plaintiff was a remote worker would permit the Court to draw the reasonable inference that the plaintiff fits within category three, and their single site of employment could be determined by where they report to or receive assignments from.  But the Amended Complaint does not plead whether the named Plaintiffs or either Subclass class members were remote workers.[62]  Rather, the Amended Complaints plead Plaintiff Franz was Sunnova's Vice President of Software Engineering, he reported to and received assignments from the Houston

---

[60] ECF No. 42-1, at ¶¶ 18, 24, 39.

[61] *See generally id.*

[62] *See generally id.*

Facility, and is a resident of California[63];   for Plaintiff Reed, the Amended Complaint pleads he is a Director of Developer Operations, reported to and received assignments from the Houston Facility, and is a resident of Texas.[64]

In the Court's view, this distinction is not without meaning. According to the reasoning applied by this Court, a remote employee is necessarily one whose primary duties involve work outside of the employer's regular employment sites, potentially placing them in category three and leading to the potential legal conclusion that a reduction in force that remote worker experienced at the site of employment they report to or receive assignments from may trigger a WARN event.   But the distinction between remote and non-remote workers may, in certain circumstances, be material.   This Court's opinion does not stand for the proposition that a non-remote employee is necessarily one whose primary duties are performed inside the employer's regular worksites, and therefore their single site of employment is presumed at that location.   To be clear, characterization of any other type of worker besides remote workers is not before the Court.   Whether or not the Plaintiffs were in fact remote workers who performed their primary duties outside of Sunnova's regular employment sites is the crux of their WARN eligibility as a matter of law.   They needed to plead those facts to allege their own WARN eligibility.   But the Plaintiffs did not do so.

While dismissal is therefore warranted at this stage, the Plaintiffs requested the Court grant them leave to amend to cure any deficiencies the Court may find in the factual allegations in the Amended Complaint.[65]   "[T]he court should freely give leave [to amend] when justice so requires."   FED. R. CIV. P. 15(a)(2).

A district court should "examine[ ] five considerations to determine whether to grant a party leave to amend a

---

[63] *Id.* at ¶¶ 18, 19.
[64] *Id.* at ¶¶ 24, 25.
[65] ECF No. 51 at 15–16.

complaint: 1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment."

*SGIC Strategic Glob. Inv. Cap., Inc. v. Burger King Europe GmbH*, 839 F.3d 422, 428 (5th Cir. 2016) (citation omitted). Rule 15 "'evinces a bias in favor of granting leave to amend,' and 'a district court must possess a "substantial reason" to deny a request.'" *Id.*

The Court agrees with the Plaintiffs that there has been no undue delay in their request for leave to amend because the Plaintiffs immediately made such request in their Response to Sunnova's first claim that the Amended Complaint was facially deficient.[66] Sunnova does not allege that there has been bad faith or a dilatory motive,[67] and the Court agrees with the Plaintiffs contention that there has been none. While the Plaintiffs previously amended the First Complaint to replead their argument in response to this Court's Order Denying Class Certification,[68] there has not been a repeated failure to cure unique deficiencies found in the Amended Complaint as to warrant a denial of leave to amend. The Court agrees with the Plaintiffs that amendment would not prejudice Sunnova because no discovery has taken place, discovery is set to continue through April 2026, and a pre-trial conference is scheduled for August 2026.[69]

Sunnova argues that any amendment to the Amended Complaint would be futile.[70] "Futility alone is a 'substantial reason' to deny leave to amend." *Whitt v. Stephens County*, 529 F.3d 278, 282 (5th Cir. 2008). Sunnova's futility argument is couched in their argument that Subpart Six only applies to truly mobile workers, and that because members of either Subclass were not truly mobile within the meaning of *Meson*, no amendments to the factual allegations in the Amended Complaint could

---

[66] ECF No. 51, at 15–16.
[67] *See generally* ECF No. 52.
[68] ECF No. 42; ECF No. 40.
[69] ECF No. 51, at 16.
[70] ECF No. 52, at 15.

cure the facial deficiency there.[71]  This Court has declined to adopt the *Meson* rule, and has concluded that a remote employee could potentially fall within category three of Subpart Six, assuming sufficient factual allegations are plead.  Granting leave to amend would not be futile.

## CONCLUSION

For the reasons stated above, the Court hereby GRANTS dismissal of the Amended Complaint without prejudice, with leave to amend so the Plaintiffs may cure facial deficiencies in their purported WARN Act and breach of contract claims.

The Plaintiffs have thirty (30) days after the date of entry of this Memorandum Opinion to file a second amended complaint.

Signed: March 03, 2026

Alfredo R Pérez
United States Bankruptcy Judge

---

[71] *Id.* at 15–16.